MONTGOMERY WARD AND COMPANY,
INCORPORATED *v.* WILLIAM E.
McFARLAND ET UX.

[No. 762, September Term, 1973.]

*Decided June 4, 1974.*

The cause was argued before MOYLAN and POWERS, JJ., and ROBERT F. SWEENEY, Chief Judge of the District Court of Maryland, specially assigned.

*Kevin J. McCarthy*, with whom were *Sasscer, Clagett, Channing & Bucher* and *Willard G. Hoeltzel* on the brief, for appellant, cross-appellee.

*Arnold Blank* for appellees, cross-appellants.

SWEENEY, J., delivered the opinion of the Court.

William E. McFarland (McFarland) brought suit against Montgomery Ward & Co., Inc., (Wards), alleging that he contracted Pasteurella Tularemia, commonly known as rabbit fever, from one of two rabbits that he purchased from a store owned by Wards in Prince George's County. McFarland alleged (a) negligence on the part of Wards in selling him a rabbit which had a communicable, infectious disease, and (b) breach of warranty as to the good health of the rabbit.

Trial was held before the Honorable Samuel W. H. Meloy and a jury of ten on October 11, 1973, and the jury returned a verdict for McFarland in the amount of $6,582.00 and an additional sum of $1,500.00 to McFarland and his wife for loss of consortium. The jury found for McFarland on the negligence count in the declaration, after first having returned a general verdict for him and being reinstructed by the trial judge that they could find on either the negligence count or the breach of warranty count, but not on both. Wards is taking this appeal from that judgment, alleging, *inter alia*, that the court erred in failing to grant its motion for a directed verdict and motion for judgment n.o.v.

McFarland has filed a cross-appeal, alleging that the court erred in requiring the jury to elect between the negligence count and the warranty count after it had rendered a general verdict. McFarland also alleges that the trial court erred in refusing to allow his physician to give his opinion as to the cause of his disease.

It appears that on the evening of February 19, 1970,

McFarland purchased two rabbits from Wards as an early Easter gift for his children. He took the rabbits to his home, where they were handled extensively by him, and to a lesser extent by his wife and three children. On the evening of the purchase he noticed that one of the rabbits was scratching a lesion on its jaw, and so McFarland applied an ointment to the jaw, rubbing it in with his finger. He also noticed that the rabbit was quiet and sluggish, had no appetite, and was not as "frisky" as the other rabbit. The next morning, on looking into the cage which housed the rabbits, McFarland found the rabbit with the lesion dead, "lying in the corner of the cage with his face in the water bowl." He cleaned out the cage, put the dead rabbit in a plastic bag, and disposed of it in the trash can. That same day he returned to Wards, where he was given another rabbit to replace the one that had died.

"A couple days" after the rabbit died, McFarland felt a pain in his jaw, noticed swelling in the jaw, and felt feverish. McFarland's condition continued unchecked for two or three weeks, at which time, he said:

> "[I] couldn't open my mouth, and the side of my face was distorted, and there was a great deal of pain with it, and you couldn't even sleep at nights."

No other member of his family shared any of these symptoms. McFarland sought medical attention from his family doctor, who, according to McFarland, diagnosed his condition as mumps and gave him a prescription. After two visits to the family physician failed to effect a cure, he was referred to Dr. James C. King, an eye, ear and nose specialist. He first saw Dr. King on March 19th, a month after the purchase of the rabbits. He testified that on that date his jaws were so swollen that he was unable to open his mouth and he "couldn't get a pencil in between [his] teeth." Dr. King prescribed additional medication and had blood tests, x-rays and throat cultures made. McFarland testified that the acute stage of his illness lasted for three weeks to a month after his first visit to Dr. King, but that he remained on medication for three months, and it was at least that long

before he could open his mouth normally. Pain continued for a "couple months" after he began treatment with Dr. King and finally diminished. The only remaining difficulty as of the date of the trial was an occasional cramp in the mouth or jaw.

McFarland testified that he lost three months from his self-employment in the drapery business, with an estimated loss of income of $1,400.00. He also said that he and his wife were unable to cohabit for three months after he became ill, and only infrequently for an indeterminate period thereafter.

Dr. King testified that when he first saw McFarland, his main complaint was swelling and pain in the face, especially in front of the right ear, and the doctor's initial impression was that "it looked like the mumps, somebody with the mumps." To assist in the diagnosis, the doctor obtained a blood count, a throat culture, and a sialogram.[1] Those tests revealed a general enlargement of the right parotid gland, with no evidence of a stone or tumor. Dr. King and his partner prescribed various antibiotics for McFarland and during the period March 19th through March 26th they saw him for a total of four times. The doctor testified that on March 26th, McFarland visited his office, and:

> "He looked very pale. He just looked obviously sick. And in the course of talking to him he got paler and paler, and finally I took him in the back room and laid him down, checked his blood pressure and talked to him a little bit more. Once he came around I said, 'Now, look, this has been going on for four or five, six weeks. We have seen you four times in a week. I want you to think about anything you have done, any place you have been, anything different you have done, any out of the ordinary thing which you started or which you did around the time that your illness started.' I said, 'It's obviously not the mumps carrying on this long. We

---

1. Dr. King described a sialogram as an injection of dye into a gland to determine whether there is infection, a tumor, or a stone.

know it's not a tumor or stone.' I said, 'It's got to be something out of the ordinary. Now, look back in your mind and see if you can think of anything out of the ordinary.' And at that point I got a blood count and ordered the throat culture on him, and he said at that time the only thing — he had talked to his wife that week and he said the only thing odd that they could think about was that he had gotten these rabbits for the children, and that the first week he had them, one of them had gotten sick with a festering sore about one of the eyes, and he tried to treat it with some antibiotic ointment at home, and that the rabbit had died and he buried it. He said that was the only thing they could think of that was out of the ordinary.

\* \* \*

"Well, I checked him for — with the history of being exposed to a sick rabbit, I was looking for —

MR. McCARTHY: Court please, I am going to object to that. There is no testimony in this case that that rabbit was sick. We don't know what is wrong with that rabbit.

THE COURT: You may proceed, sir. Overruled.

[DR. KING]: I checked the gentleman for any ulcers or sores on his hands. I checked his axilla, which is under the arm, for lymphnodes. I checked his neck for lymphnodes, and I checked his groin for lymphnodes. I felt his belly for any enlargement of the spleen or liver.

BY MR. BLANK:

Q. Did you look for lesions or other marks about the body?

A. Yes.

Q. Anything show?

A. No.

THE WITNESS: I felt I was treating him for an

infection in the salivary gland caused by Rabbit Fever. I then proceeded to run a number of tests to try and either prove or disprove this matter. I talked to our pathologist.

BY MR. BLANK:

Q. I don't think we can get into hearsay at this point, Doctor.

A. Right.

Q. Doctor, then it is your testimony that your diagnosis is Rabbit Fever?

THE WITNESS: I felt I was treating him for Rabbit Fever, more specifically causing an infection in his right parotid gland."

When asked to state his diagnosis of McFarland's illness, Dr. King said:

"My diagnosis was sialadentis of the right parotid gland caused by Pasteurella Tularemia".

On examination as to his qualifications as an expert on infectious diseases, the doctor testified that he had never treated a case of rabbit fever prior to McFarland's case and had treated none since. He was not permitted to testify as to whether he had an opinion with reasonable medical certainty as to the *cause* of McFarland's infection, but he did state that in making the diagnosis of rabbit fever, he had *assumed* that the rabbit handled by McFarland had been infected with that disease. The doctor also testified that the only thing he knew about tularemia in rabbits is that:

"... these animals are very slow, they don't run fast. How it manifests itself from what a vet would be looking for, I don't know."

McFarland then called a veterinary doctor, David Tayman, who was only permitted to testify after strenuous objections by Wards, because of the failure of McFarland to give them notification of his intention to call the doctor. The court ascertained that the witness had been obtained only the night before the trial and that Wards' attorney had been

notified the morning of the trial, and held that since Wards had not sought a continuance in order to depose the witness, his testimony would be permitted. We find no error in that ruling.

Dr. Tayman testified that he had been a practicing veterinarian for four and and one-half years and was a graduate of Michigan State University. Asked to describe the symptoms of a rabbit infected with pasteurella tularemia, he responded:

> "[A] rabbit with tularemia would show a general weakness, it would be depressed, it may be running a fever, and it would show symptoms of litter disorder."

He stated further that it would have little appetite and would be generally listless, and that the disease was fatal. Of particular interest was his interrogation on whether an animal with rabbit fever would display external lesions:

> "Q. Doctor, would there be any other signs in the way of markings such as lesions or cuts or bruises or boils?
>
> A. No.
>
> Q. Would a lesion be inconsistent with tularemia?
>
> MR. McCARTHY: Objection.
>
> THE COURT: Overruled.
>
> THE WITNESS: A lesion, exterior lesion?
>
> MR. BLANK: Yes.
>
> THE WITNESS: It probably would be inconsistent, but it is transmitted by the saliva, also.
>
> THE COURT: You say, 'inconsistent'?
>
> THE WITNESS: Right. Most of the lesions are internal.
>
> BY MR. BLANK:
>
> Q. Are there ever lesions on the external?
>
> MR. McCARTHY: Objection.
>
> THE COURT: Overruled.

THE WITNESS: As far as I know, not really. The lesions — again, most of the lesions are internal. It affects viscera, or the insides, of the animals.

BY MR. BLANK:

Q. When you say, 'most,' Doctor, does that mean that some are on the outside?

MR. McCARTHY: Objection, Your Honor. This is his witness. He is cross-examining him now.

THE COURT: I don't think he is cross-examining. Overruled.

THE WITNESS: 'Ever', is an awfully big word, and I assume there probably could be a lesion on the outside."

The doctor testified further that the incubation period for tularemia in a rabbit was from 24 hours to a week and that if the rabbit had died because of tularemia, he would assume that it had the disease 24 hours prior to its death.

On cross-examination, the veterinarian was asked:

"Q. Doctor, is there any way short of an autopsy that you could tell with reasonable medical certainty what was the cause of this particular rabbit's death?

A. No.

MR. McCARTHY: No.

THE COURT: What is the incubation period between a diseased rabbit and a human being if contact is made?

THE WITNESS: Again, I assume it's probably about anywhere from four days to seven days or so.

THE COURT: From four to seven. Any earlier?

THE WITNESS: That I can't say. I have never been in contact with a person per se that has had tularemia.

THE COURT: All right, sir, you are excused."

Dr. King was recalled and on cross-examination he was

questioned concerning the tests that he had made on McFarland:

"Q. You took a throat culture and was this culture to determine whether or not there were any bacteria in his throat at that time from Pasteurella infection, Rabbit Fever?

A. It was to determine if there were any pathogenic bacteria, specifically we were looking to see if there were any Pasteurella, but we did not isolate any. That culture was done on the 1st of April at Prince George's.

Q. So it's my understanding, then, that when you took the throat culture to try to isolate Pastuerella organisms, it was negative, there weren't any?

A. Correct.

Q. Now, you also said you took blood samples?

A. Blood count was done —

Q. Blood count —

A. — on the 26th of March. This was one week following our — his first visit. As I said, he looked even sicker and we had seen him four times that week. So we got a blood count to see if there was — see what was what.

Q. Now, did you also have blood samples taken at your direction at Prince George's Hospital? . . . .

A. Yes. They were taken on March 30th and on the 1st — I believe it was the 1st of July.

Q. Let me ask you this, Doctor. After a man has had Pasteurella infection, or Rabbit Fever, does he produce certain antibodies that remain in the blood stream for some time?

A. He should.

Q. And how long will they remain in the blood stream?

A. It's indeterminate.

Q. At least a year?

A. Generally speaking.

Q. Now, when a blood sample was taken to be tested to see whether it had any antibodies on July the 1st, this would have been within six months, wouldn't it, Doctor?

A. Yes.

Q. And can you tell me, Doctor, was that blood sample positive or negative for antibodies?

A. Negative.

On redirect examination, the doctor testified that the antibiotics taken by McFarland could possibly have been responsible for the fact that antibodies were not found in the medical tests, and that the negative results in the various tests did not rule out that McFarland did have tularemia. On recross-examination, the doctor confirmed that not having physically examined the rabbit, he was unable to testify that the animal was, in fact, diseased.

Asked by the court how pasteurella tularemia manifests itself in humans, the doctor replied:

"THE WITNESS: Judge, it depends on who you read. There are about six different forms of tularemia that people can get. The most common form is when there is an ulcer on the finger, hand, enlarged lymphnodes in the axilla. There is another form that is a flu-like form; you know, like the flu we get in the winter. There is a form that looks like tonsillitis, swelling of the nodes. It can involve the eye. If somebody has been treating or autopsying or experimenting with a rabbit or an animal with tularemia, and is not careful and is wiping an eye, he can get an eye form. In other words, it's not a single thing. There are a number of different things.

THE COURT: How did it manifest itself in your patient?

THE WITNESS: In my patient it manifested itself by infection of this gland and general overall debility."

The remaining testimony in the case was by Mrs. McFarland and related almost exclusively to loss of consortium. At the conclusion of her testimony, McFarland rested, and Wards made a motion for directed verdict as to all counts, alleging that there was no evidence that McFarland had tularemia, and, therefore, nothing to show either negligence or breach of warranty on the part of Wards. McFarland's attorney asserted that the evidence was sufficient, although circumstantial, to show that the rabbit was infected with tularemia and since Dr. King's diagnosis was that McFarland had tularemia, a jury question existed. The court reserved its rulings on Wards' motion.

Wards then rested its case without putting on any evidence, and renewed its motion for directed verdict, on which motion the court also reserved its ruling.

Only one portion of the court's instruction is pertinent to the case before us. The court advised the jury:

"Your verdict in this matter may be for Mr. McFarland under either the negligence or breach of warranty count, if you should so find, and then you would award a single sum as fair compensation for the injuries received, or it may, of course, be simply for the Defendant.

"The last count may be an award, if you should so find for both Mr. and Mrs. McFarland on the consortium, or that may be, of course, for the Defendant."

When the court asked for exceptions, the following colloquy ensued:

MR. BLANK: Judge, did I understand you to say that the jury may find one verdict for Mr.

McFarland in either count or Count 2?

THE COURT: Yes, either/or.

MR. BLANK: They understand it's not two verdicts?

THE COURT: No, one verdict. They may find one verdict under either Count for Mr. McFarland or for the Defendant.

MR. BLANK: But only one recovery?

THE COURT: But only one recovery. But they may find a verdict for both of them under the third count or for the Defendant.

MR. BLANK: Fine. I have no exceptions to that."

The jury retired and returned with a "general verdict" for the McFarlands, to which Wards' counsel objected, and the following exchange ensued:

"MR. McCARTHY: I would move for mistrial until it's pointed out which count they found as to.

THE COURT: Which count did you find, Mr. Foreman, on the negligence count or the warranty count?

THE FOREMAN: On both counts.

MR. McCARTHY: That is inconsistent with your instructions.

THE COURT: It can't be but only one count. The jury will return to the jury room and continue deliberations as to which count. . . .

(Whereupon, at 6:37 p. m. the jury retired to further consider its verdict, and at 6:39 p. m. the jury returned to the courtroom and the following proceedings took place in open court:)

* * *

'THE COURT: . . . announce your verdict as to which count you find for the plaintiff, William E. McFarland.

THE FOREMAN: On the negligence count, Your Honor. That is what I stated at first, I think.

THE COURT: And what damages do you assess for the Plaintiff, William E. McFarland, on the negligence count? . . .

THE FOREMAN: It would be $6,582.

THE COURT: Very well. Go ahead with the rest.

THE DEPUTY CLERK: What damages do you assess as to William E. McFarland and Mary Ann McFarland in their joint count for loss of consortium?

THE FOREMAN: $1500.

MR. McCARTHY: May we have judgment nisi entered for the Defendant as to Count 2?

THE COURT: Judgment nisi will be entered for the plaintiff. As to Count 1, Plaintiff, William E. McFarland, and for the Plaintiffs, William E. McFarland and Mary Ann McFarland as to Count 3, and for the Defendant as to Count 2."

Subsequently, after hearing argument, the court denied the motion n. o. v. filed by Wards.

The primary question before us is whether or not it was erroneous for the court to deny that motion. It is well established in Maryland that if there is any competent evidence, however slight, leading to support the plaintiff's right to recover, the case should be submitted to the jury and the motion for directed verdict or the motion for judgment n. o. v. denied. *Belleson v. Klohr,* 257 Md. 642; *Miller v. Michalek,* 13 Md. App. 16. In considering such a motion, the court must assume the truth of all credible evidence and of all inferences fairly deducible therefrom, and consider them in the light most favorable to the party against whom the motion is made, and if such evidence and inferences lead to conclusions from which reasonable minds could not differ, then the issue is one of law for the court, and not one of fact for the jury. *Buchanan v. Galliher and Harless,* 11 Md. App. 83, *cert. denied,* 261 Md. 722; *Burns v. Goynes,* 15 Md. App. 293; *Lauer v. Scott,* 12 Md. App. 555. Thus, where it is manifest to the court upon the plaintiff's own showing in the uncontradicted evidence in the case that

there is no rational basis upon which a verdict can be based for the plaintiff, it becomes the duty of the court to direct a verdict for the defendant or grant a motion for judgment n. o. v. in favor of the defendant. *Lusby v. First Nat'l Bank*, 263 Md. 492, 506.

From our review of the record in this case, we can find no competent evidence to support the plaintiffs' right to recover. We are simply unable to identify any evidence that the rabbit was infected with the disease pasteurella tularemia, and there is no credible evidence that McFarland was infected with that disease.

Dr. Tayman, the veterinarian, did not express any expert opinion on whether the rabbit was afflicted with pasteurella tularemia. In general, his testimony was more harmful than helpful to McFarland. Dr. Tayman testified that the symptoms of rabbit fever are (1) general weakness, (2) depression, (3) fever, (4) litter disorder, and (5) little or no appetite. McFarland testified that the rabbit was sluggish and had no appetite, but there was no testimony about litter disorder and no evidence of fever. There was no testimony that the rabbit was depressed (nor were we told how one identifies depression in a rabbit). Although McFarland testified at considerable length that there was an external lesion on the jaw of the rabbit, Dr. Tayman repeatedly testified that such lesions were not symptomatic of rabbit fever, four times making that statement before saying, under the repeated questioning of McFarland's attorney, " '[never]' is an awfully big word and I assume there could be a lesion on the outside."

We do not underestimate the difficulties of supplying competent expert evidence as to whether the rabbit in question was infected with pasteurella tularemia. It is understandable that the carcass was disposed of immediately after the rabbit's death and no autopsy made, for the disease was not even suspected until four or five weeks after the rabbit died. Unfortunately, however, without an autopsy on the rabbit, or some other scientific test or analysis, neither McFarland nor his veterinary expert was in a position to offer competent testimony as to whether

the rabbit was infected with a contagious disease. Their testimony in this regard was speculative, and not worthy of consideration by the jury.

The testimony as to McFarland's illness is similarly deficient. Dr. King testified that he first treated McFarland for mumps, and then later diagnosed the illness as rabbit fever. It is obvious, however, that this latter diagnosis was tentative, and not confirmed by later tests. The physician candidly admitted that he had never before or since seen a human being infected with pasteurella tularemia. He stated that his research revealed that there are "about 6 different forms of the disease," and he briefly described four of them, none of which fit the symptoms described by his patient. Additionally, the doctor testified that the throat culture taken in an attempt to isolate pasteurella tularemia organisms bore negative results, and the blood sample taken approximately three months after the illness began revealed no antibodies in the blood stream, notwithstanding the fact that one infected with the disease would normally carry such antibodies for a year.

It is obvious to us from a careful review of the physician's testimony that the only basis for his diagnosis of rabbit fever was his knowledge that McFarland had been exposed to a rabbit which had been listless, lacked an appetite and suddenly died. We do not mean to impugn the ability or qualifications of the physician, for it is obvious that he was faced with a baffling illness, and he appropriately explored every avenue to find the cause. It is to his credit that the illness was finally cured, but as a matter of law, his diagnosis was speculative and not sufficient to have permitted the question to be presented to the jury.

McFarland argues that the evidence, although circumstantial, was sufficient to create a jury question. It is true that circumstantial evidence may be sufficient to support a rational inference in many cases, but it may not sanction conjecture. *Morris v. Twigg,* 190 Md. 324; *Perdue v. Brittingham,* 186 Md. 393; *C. & P. Telephone Co. v. Noblette,* 175 Md. 87. All of the plaintiff's evidence in this case, taken together, does not rise above speculation, hypothesis, and

conjecture, and it does not lead to the desired conclusion with sufficient certainty to have permitted submission of the question to the jury.

We hold, therefore, that it was error for the trial judge to deny the motions for directed verdict and the motion for judgment n. o. v. Since we have reached this conclusion, it is not necessary for us to rule on the other questions raised by Wards.

In his brief in support of his cross appeal, McFarland asks that that appeal be considered only in the event that we reverse or grant a new trial as to the judgments entered on the negligence count of the declaration. He asserts that he should prevail on the warranty count, even if we find that Wards prevails on the negligence count. Several factors bar that result. First is that McFarland took no exception to the instructions of the trial judge in which the jury was told that they must choose between the negligence and the warranty counts. Maryland Rule 554 requires that exceptions be taken and the reasons therefor given at trial, in order to preserve the point for appellate review. *Kraft v. Freedman*, 15 Md. App. 187; *Podolski v. Sibley*, 12 Md. App. 642. The rule applies with the same force to amended instructions as it does to the original instructions. *Casey v. Roman Catholic Arch.*, 217 Md. 959. Since McFarland did not raise the point below, he cannot now raise it in this appeal. We feel constrained to add that had exceptions been taken below, it would have availed McFarland nothing, for since we find no competent evidence that either the rabbit or McFarland was infected with pasteurella tularemia, the jury was no more entitled to consider the warranty count than the negligence count.

McFarland's remaining point on the cross appeal is equally without merit. He alleges that the trial court erred in refusing to allow Dr. King to give his opinion as to the cause of the plaintiff's disease. Assuming, arguendo, that the court did err in this regard, we believe it to be harmless error, as the physician admitted on cross-examination that he was unable to testify as to whether the rabbits sold to McFarland by Wards were infected with any disease. He

could not, therefore, have established that contact with those rabbits was the cause of McFarland's illness, and we can conceive of no other response which would have been in any way helpful to the plaintiff.

*Judgment reversed; costs to be paid by appellees.*