BEVERLY BERNSTEIN, SAMUEL COHN AND ALBERT ABRAMSON, EXECUTORS OF THE ESTATE OF BERNARD LIBBY ET AL. *v.* ALEXANDER REFORZO ET AL.

[No. 70, September Term, 1977.]

*Decided November 9, 1977.*

The cause was argued before MORTON, THOMPSON and LISS, JJ.

*William H. Clarke* for appellants.

*Peter J. Messitte,* with whom were *Messitte & Rosenberg, P. A.* on the brief, for appellees.

THOMPSON, J., delivered the opinion of the Court.

Alexander Reforzo was a tenant in the Blair Towers Apartments at 8103 Eastern Avenue on April 18, 1970, when his son, John, age 9, was injured while playing with a friend who resided at 8101 Eastern Avenue, a part of the same apartment complex. The friend had a toy gun and was urging John to stay and play with him despite John's desire to go home and eat. They wrestled and then the friend proceeded to chase John through a corridor of the apartment building. John, who was "jogging," approached the exit doors to the building at 8103 Eastern Avenue and pushed below the pushbar on a glass exit door as he had done before without incident. This time, however, the glass shattered and John pitched through the lower half of the door and was stabbed in the left eye by shards of glass. Immediately after the accident, his left eye was removed by surgery, and eventually a plastic eye was inserted in its place. The door in

question was marked with decals and was equipped with a pushbar for use in opening the door. Prior to the accident, John had been warned on at least two occasions by the apartment manager not to run in the corridors.

The Reforzos, the appellees, instituted suit in the Circuit Court for Montgomery County alleging the injury occurred as the result of the negligence of the owners of the Blair Towers Apartments, the appellants. The jury returned verdicts in favor of John Reforzo and Alexander Reforzo in the amounts of $125,000 and $3,513.91 respectively. On appeal the appellants argue the trial judge committed a number of reversible errors. Due to our disposition of the case, we need to discuss only whether the trial judge erred in refusing to grant the appellants' motion for a directed verdict.

The appellees' claim of the negligence is grounded on the evidence that the door in question contained 1/4" polished plate glass rather than a stronger type of glass, such as tempered glass. The appellants argue that this is legally insufficient to support a finding of negligence. We agree. In deciding this issue we must consider all the evidence along with all logical and reasonable inferences deducible therefrom in a light most favorable to the appellees and if there is any evidence of negligence, however slight, the denial of the appellants' motion for a directed verdict must be upheld. *Beahm v. Shortall,* 279 Md. 321, 368 A. 2d 1005 (1977).

The testimony revealed that the apartment building in which the accident occurred was part of a complex designed in 1958 by Joseph H. Saunders, an architect with an office in Alexandria, Virginia. The plans for the four apartment buildings called for exterior lobby glass doors of tubulite design with even aluminum frame and 1/4" polished plate glass. The architect testified that he specified the particular glass because "it was a normal standard entrance used in thousands of other buildings at the time, stores, apartments, whatever." He stated that he did not specify Herculite (tempered) glass doors which were 5/8 to 3/4" thick because they were not in keeping with the architectural design of the

projects and were substantially more expensive than the doors specified. The building was designed to meet the 1958 Code requirements of Montgomery County.[1] The plans were approved by the Building Construction Department of Montgomery County and building permits were issued. Although the plans did not specify interior doors, during the construction the owners added interior doors which were similar to the exterior doors to form vestibules to the apartments. The apartment complex was constructed during 1959 and 1960, after which it was subject to two inspections by the county authorities and was approved even though the original plan had not been amended and the extra doors were not specifically approved.

The evidence introduced by the appellees on which their claim of negligence rests consisted of the testimony of one expert witness, Mr. Mario Zeolla. Mr. Zeolla was an architectural glass consultant who was employed in the Research Department of the Pittsburgh Plate Glass Company from 1943 to 1973, when he retired. After 1973, he became a glass consultant and testified in courts around the country pertaining to matters involving glass. He has been a member of the Glass Door Safety Committee of the Architectural Aluminum Manufacturers Association since 1963, and from 1968 until 1974 he was Chairman of the Consumer Safety Glass Committee. Mr. Zeolla has also written numerous articles on the subject of glass door safety.

Mr. Zeolla was familiar with the type of 1/4″ polished plate glass tubulite design doors that were used in the apartments. He testified that the shattering level of the glass was an average of 40 foot pounds but it could range from 25 to 80 foot pounds.[2] A child approximately 54 inches tall, weighing 70 pounds and walking at 4 miles per hour would exert about 38 foot pounds, but if the child were jogging, he would be traveling about 8 miles per hour and

1. The Montgomery County Building Code specified that apartment doors contain 7/32″ polished plate glass.

2. A 40 foot pound impact force is equivalent to dropping a 40 pound weight from the height of one foot on a horizontally supported piece of glass.

have an impact, if he struck the glass at that speed, of 105 foot pounds. After he explained the characteristics of polished plate glass, Mr. Zeolla noted that at the time the building was constructed, other types of glass were available such as heavy plate glass, tempered glass, wire glass, and laminated glass. According to his testimony, tempered glass was three or four times more resistant than polished glass of the same thickness while wire glass, although no stronger than polished plate glass, presented less of a danger because the broken fragments were retained mechanically by the wire mesh. This same effect could also be achieved through the use of laminated glass. In 1958 tempered glass was about 2-1/2 times the price of polished glass.

In his dealings with glass customers, Mr. Zeolla normally recommended the use of tempered glass. His recommendation was made in part on his study of accidents with glass doors. This study revealed that individuals approaching doors often will push on the glass, either with their hand or their shoulder, even though the door contains a pushbar or some other similar device. He stated that in 1960 the National Safety Council became involved in the study of accidents involving plate glass doors and helped disseminate information concerning the safety of the doors in trade magazines and popular journals during the period from 1958 to 1970.

The direct examination of Mr. Zeolla concluded with a hypothetical question to which he responded:

> "In my opinion, with quarter-inch plate glass in a door and all of the other statements you have made involving children who will require, who are required to use that door, realizing that children are the most active segment of our society, my opinion would be that application is unreasonably unsafe."

By Mr. Messitte:

> "Q. Can you use the word 'inherently' unsafe? Does that apply?
>
> "A. Yes."

On cross-examination Mr. Zeolla admitted there was nothing unusual about the use of plate glass in a door of this type. Rather, its use was widespread. The appellants produced testimony that doors of a similar type were in use in the courthouse in which the case was being tried. They also produced evidence that the doors in question were serviced every three or four months by a firm specializing in that type of business and that they were last serviced in the beginning of 1970. There had been no other accidents involving glass doors in the apartment complex. There was no evidence that the doors in question were in any way scratched or damaged.

The basic legal principles governing the liability in this type of case are well settled. No presumption of negligence on the part of an owner arises because injury has been sustained by a tenant, for the owner is not an insurer of the safety of tenants or others. Where a landlord leases portions of the premises to different tenants and retains control of those portions of the property used in common by all the tenants, he must use ordinary care to keep portions retained under his control reasonably safe. *Ramsey v. D.P.A. Associates,* 265 Md. 319, 289 A. 2d 321 (1972); *Elmar Gardens, Inc. v. Odell,* 227 Md. 454, 177 A. 2d 263 (1962). In determining whether something is in a reasonably safe condition, the Court of Appeals in *Long v. Joestlein,* 193 Md. 211, 216-217, 66 A. 2d 407 (1949), stated the general rule as follows:

> "It is an accepted principle in the law of negligence that, in the construction and maintenance of a building, the owner discharges his obligation to exercise due care toward those to whom he owes a duty to keep the premises in a reasonably safe condition if he conforms to established custom in the particular instance, provided that such customary method of construction and maintenance is not inherently dangerous or obviously improper." [3]

---

3. In discussing the liability of employers to provide a safe place for

The rule was reiterated in *Ramsey v. D.P.A. Associates, supra* (265 Md. at 321).

The testimony revealed that it was customary to use glass doors containing 1/4″ polished plate glass in apartments during the period in question. This established the custom in the trade and the evidence showed that the appellants had complied with that custom. Our inquiry must, therefore, focus on whether the use of such glass was "inherently dangerous or obviously improper."

In order for polished plate glass to be deemed "inherently dangerous" it must be dangerous in its ordinary, non-defective state. *Watts v. Bacon & Van Buskirk Glass Co.*, 18 Ill. 2d 226, 163 N.E.2d 425 (1959); *La Plant v. E. I. Du Pont de Nemours & Co.*, 346 S.W.2d 231 (Mo. App. 1961); *General Bronze Corp. v. Kostopulos*, 203 Va. 66, 122 S.E.2d 548 (1961). Utilizing this definition we have no trouble

---

employees to work, the Court in Long Company v. State Accident Fund, 156 Md. 639, 144 A. 775 (1929) said:

" 'The true rule has been nowhere better stated than in Titus v. Bradford R. R., 136 Pa. 626, in which the court said: "Absolute safety is unattainable, and employers are not insurers. They are liable for the consequences not of danger, but of negligence, and the unbending test of negligence in methods, machinery and appliances, is the ordinary usage of the business. No man is held by law to a higher degree of skill than the fair average of his profession or trade, and the standard of due care is the standard of the average prudent man. *The test of negligence in employers is the same, and however strongly they may be convinced there is a better and less dangerous way, no jury can be permitted to say that the usual and ordinary way commonly adopted by those in the same business is a negligent way."* ' " (Emphasis added). *Id.* at 653-654.

"In our opinion, notwithstanding the failure of the employee of the appellant to detect the weakness of the particular joist which broke, due to the presence of knots, when that joist was only to be used in a temporary structure, and when it is shown that it broke before the temporary structure was completed, and further, that, *in the purchase of the lumber of which the broken joist was a part, the type and grade used was that usually and customarily used by contractors and builders generally, the grade being such as usually contained knots,* there was no actionable negligence on the part of the appellant, and the jury should not have been permitted to bring in a verdict for the plaintiff because they may have believed there was a better and safer way to have constructed the temporary forming. It follows that the trial court erred in not granting the defendant's 'A' prayer, directing a verdict for defendant, and for this reason the judgment must be reversed." (Emphasis added). *Id.* at 655.

concluding the glass is not "inherently dangerous." There is no evidence that there is any inherent danger in the use of plate glass such that special precautions, other than those used here, must be taken in order to prevent injury.[4] Plate glass has been used in thousands of buildings without incident. The usual items which fall within the category of "inherently dangerous" are explosives and poisons.

Similarly the use of polished plate glass cannot be deemed "obviously improper." That term refers to situations where the industry standard is obviously unsafe or, because of some factor not inherent in the trade generally, another method of maintenance is dictated. An example of the latter case was presented in *Honolulu Ltd. v. Cain*, 244 Md. 590, 224 A. 2d 433 (1966). There, because of the particular drainage conditions of a parking lot the application of the standard method of snow removal increased the danger of personal injury. The defendant had argued use of the standard procedure discharged his duty of care. The Court of Appeals rejected this argument stating:

> "Conformance to an industry standard is, of course, often weighty evidence that the action in question is reasonable and non-negligent. It is not, however, conclusive evidence .... When circumstances make the customary method 'inherently dangerous or obviously improper' the duty of reasonable care requires a change from ordinary practice." *Id.* at 598.

In the instant case the only circumstances that might dictate deviation from the industry custom was the fact the apartment complex in question contained a number of children. While this is an appropriate factor to be considered, we do not think the evidence introduced at the trial warranted a finding that the industry standard was improper under these circumstances. The testimony showed that on the average 1/4″ polished plate glass would break on an impact of 40 foot pounds and that the range of breakage

---

4. It should be noted the doors were equipped with decals and safety bars.

was from 25 to 80 foot pounds depending upon the condition of the glass. A child walking and pushing on the glass would not exert sufficient force to break the glass, but a child running and pushing on it might. The precise question we are called upon to decide, therefore, is whether or not the appellants could be found negligent because the glass in the doors might not withstand a blow from a running child. Under the particular facts of this case, we do not think that they could. The glass in question was recommended by an architect and met the building code requirements. It was installed in 1959 or 1960 and from the date of installation until 1970 there were no incidents involving the glass doors. The mere fact that stronger materials could have been used in construction or were available for replacement is insufficient to support a finding of negligence.[5] *Long Co. v. State Accident Fund, supra. Cf. Watts v. Bacon & Van Buskirk Glass Co., supra* (negligence found where architect had recommended tempered glass in a drugstore and there had been a previous accident involving the glass door in question).

In deciding the appellants were not negligent as a matter of law we have not ignored the testimony of the appellees' expert witness, but the testimony of an expert giving his opinion that an object is inherently dangerous does not make it so. It is well settled in Maryland and elsewhere that an expert's opinion is no better than the facts on which it is based. *A. H. Smith Sand & Gravel Co. v. Department of Water Resources*, 270 Md. 652, 313 A. 2d 820 (1974); *Anderson v. Sawyer*, 23 Md. App. 612, 329 A. 2d 716 (1974), *cert. denied*, 274 Md. 725. See particularly *Long v. Joestlin, supra:*

> "At the trial of this case E. Russell Marcks, former president of the Maryland Society of Architects, produced by plaintiff as an expert witness, expressed the opinion that it is not good architectural practice to put a single step at the end

---

5. The appellees could not be required to foresee that the legislature of Maryland would in 1973 require installation of a stronger glass in new apartment installations. *Md. Code*, Art. 41, § 266GG.

of a hall several feet away from a stairway, as the step might be overlooked. Plaintiff argued that inasmuch as her expert witness and defendant's expert witness entertained contrary opinions as to whether the step was dangerous, there was a conflict in testimony which warranted submission of the case to the jury. However, we think defendant could not be held guilty of negligence even if plaintiff's witness testified that the step was dangerous. There was no dispute as to the condition of the step, the landing and the stairway. The riser of the step measures 8 inches, the same as each of the risers in the stairway. There was nothing about this particular step to make it unusual. No admission in evidence of expert opinion can establish liability for negligence where common knowledge shows that there was no danger so substantial that a man of ordinary prudence in the position of the defendant would have anticipated injury and guarded against it. *Pastrick v. S. S. Kresge Co.*, 288 Mass. 194, 192 N. E. 485; *Johnson v. Town of Orange*, 320 Mass. 336, 69 N. E. 2d 587." (193 Md. at 219).

We are unimpressed with the appellees' argument that because the doors were added after the plans had been approved there was a failure to comply with the building code. The code called for 7/32″ polished plate glass while the doors in question were 8/32″ and there is nothing about the placement of the doors that increased the danger of personal injury. The addition of the doors could not be the proximate cause of the injury.

*Judgments reversed.*
*Appellees to pay the costs.*