539 A.2d 701

Craig C. ZIEGLER

v.

KAWASAKI HEAVY INDUSTRIES, LTD., et al.

No. 1013, Sept. Term, 1987.

Court of Special Appeals of Maryland.

April 7, 1988.

Certiorari Denied June 27, 1988.

William J. Blondell, Jr. (Edward T. Pinder, on the brief), Baltimore, for appellant.

James K. Archibald (Venable, Baetjer and Howard, on the brief), Baltimore, for appellees.

Argued before GILBERT, C.J., and WEANT and BLOOM, JJ.

GILBERT, Chief Judge.

This appeal involves a strict liability action by Craig C. Ziegler against Kawasaki Heavy Industries, Ltd., et al.,[1] (jointly referred to as "Kawasaki") in the Circuit Court for Baltimore City for the enhanced personal injuries he sustained as the result of an alleged design defect in a Kawasaki motorcycle.

---

1. The other defendant-appellees are Kawasaki Motor Corp., U.S.A. and Kawasaki Ltd. of Eastpoint.

Ziegler purchased a Kawasaki KZ 650 motorcycle in July 1980. Approximately two months later he was struck by an automobile which made a left turn into the side of the motorcycle. Ziegler sustained serious lower left leg injury requiring extensive medical treatment. The suit filed by Ziegler alleged that Kawasaki knew or should have known that "structural modifications to the frame of a motorcycle ... can be incorporated into the design of the motorcycle to prevent or lessen the severity of lower extremity injuries to the operator ... but failed to manufacture and/or sell motorcycles into which the design safety features have been incorporated." The Ziegler complaint contained four counts: (1) negligence; (2) a claim of breach of express and implied warranties; (3) an assertion of strict liability under § 402A of the Restatement (Second) of Torts (for the defective design); and (4) an alleged action of liability under § 402B of the Restatement (Second) of Torts (for misrepresentation in advertising).

Prior to trial, Ziegler voluntarily dismissed counts 1 and 2 (negligence and breach of warranties). He further limited his claims to those injuries which he could show were enhanced by the alleged design defect. To remove from the case the joint tort-feasor, Barbara Wittig, the operator of the automobile that struck him, Ziegler settled his claim against her and executed a joint tort-feasor release.[2]

After Ziegler had concluded his evidence at trial, Judge Mary Arabian granted Kawasaki's motion for judgment as to count four but denied the motion as to count three, the claim of strict liability under § 402A of the Restatement (Second) of Torts. At the conclusion of all of the evidence, Kawasaki renewed its motion for judgment. Judge Arabian reserved ruling thereon and sent the case to the jury. When, after three days of deliberations, the jury was unable to render a unanimous verdict,[3] the trial court declared

---

**2.** Ziegler and Wittig settled his case against her upon payment to him of the limits of Wittig's insurance policy—$50,000.

**3.** The jury was deadlocked 11–1 in favor of defendants.

a mistrial. By operation of Md. Rule 2–532(b), the motion for judgment was transformed into a motion for judgment *non obstante veredicto*.[4] Judge Arabian granted the motion, ruling that, as a matter of law, "reasoning minds could not differ as to the question of whether there was a defect in the design."

Initially, Ziegler, in this Court, posited four issues, two of which related to alleged erroneous instructions to the jury, one averred error, on the trial judge's part, in not directing a verdict in Ziegler's favor, and a fourth charged that the judge erred in failing to submit to the jury the issue of the necessity of a warning to Kawasaki motorcyclists as to the risk of leg injury.[5]

After the appellees' brief had pointed out defects in appellant's issues, Ziegler promptly restructured the issues in a reply brief. That reformation, reduced to its common denominator, results in the issue before us being: Did the trial court err in granting a judgment n.o.v. for the defendants? [6]

---

**4.** Maryland Rule 2–532(b) provides, in pertinent part: "If the court reserves ruling on a motion for judgment made at the close of all the evidence, that motion becomes a motion for judgment notwithstanding the verdict if the verdict is against the moving party or if no verdict is returned."

**5.** The issues presented read as follows:
"1. Did the trial court commit reversible error by refusing to instruct the jury as to the elements of Restatement (Second) of Torts Section 402A and instead instructing the jury that they must consider factors that refer to negligence in determining strict liability?
2. Did the trial court err by refusing to submit to the jury the issue of the necessity of a warning as to the risks of danger and injury on a motorcycle without lower leg protection?
3. Did the trial court commit reversible error by not directing verdict for the plaintiff after the defendants admitted that the product was unavoidably unsafe and failed to provide any warning?
4. Did the trial court commit reversible error by submitting to the jury a special verdict sheet which requested a finding that the motorcycle was unreasonably dangerous for an intended and reasonable manner of use rather than a foreseeable purpose?"

**6.** In his reply brief Ziegler restated the issues as:

We will focus on that question after we dispose of Ziegler's repeated allegation, at trial as well as on appeal, that the trial court erred in not submitting to the jury Kawasaki's "failure to warn" Ziegler of the unreasonable danger in riding a motorcycle.

### Defect Due to Failure to Warn

Count three, paragraph 27 of the complaint expressly limited the strict liability claim to one defect, *scilicet:* "That the aforedescribed motorcycle was defective at the time it was sold to the Plaintiff in that it contained a harmful defect *inasmuch as it did not include a design modification or other equipment* which would prevent or minimize lower extremity injuries to the operator in side impact collisions." (Emphasis added.)

During the trial, Ziegler attempted to expand his paragraph 27 averment to include a "failure to warn" him of the dangerous and unsafe characteristics of the motorcycle. He maintained that the allegations contained in his negligence count which relate to failure to warn had been incorporated by reference into his strict liability count. We think Judge Arabian properly rejected appellant's reasoning. The judge correctly ruled that "failure to warn" was not a matter to be considered in this case since it was a separate claim that had not been alleged as a defect in count 3.

---

"I. The trial court erred by granting judgment for the Defendants because incorrect holdings of strict liability law were applied.
A. The trial court clearly erred by dismissing the failure to warn strict liability allegation against the Defendant.
B. The trial court erred by granting judgment for the Defendants, as there was sufficient evidence to support a finding that the motorcycle was unreasonably dangerous, had the proper Maryland law been applied.
C. The Appellant presented sufficient evidence for a jury to find that his injuries were enhanced by the failure to include side impact protection on the motorcycle.
D. The Appellant presented sufficient evidence for the jury to return a verdict of punitive damages."

W. Keeton in *Prosser and Keeton on Torts* (5th ed.1984) states, at 645, that a product may be defective for any of the following three reasons: "(1) a flaw in the product that was present in the product at the time the defendant sold it; (2) a failure by the producer or assembler of a product adequately to warn of a risk of hazard related to the way the product was designed; or (3) a defective design." *See generally* E.S. Digges & J.G. Billmyre, *Product Liability in Maryland: Traditional and Emerging Theories of Recovery and Defense,* 16 U.Balt.L.Rev. 1, 11–19 (1986).

■ Count one of Ziegler's complaint contained allegations that Kawasaki acted negligently by failing "to advise the Plaintiff of the dangerous and unsafe characteristics of the motorcycle designed, manufactured, distributed and/or sold by them." Although that and other allegations were incorporated by reference in count three, the allegations did not assert that failure to warn was a defect in the product which thereby made it unreasonably dangerous. What Ziegler actually averred was that the conduct of the manufacturer was unreasonable. Since the negligence claim was voluntarily dismissed before trial, the failure to warn issue was properly excluded from jury consideration.

The purpose of pleadings is that the parties litigant may be appraised of the matters in controversy. *Pearce v. Watkins,* 68 Md. 534, 13 A. 376 (1888). It is, therefore, necessary that the cause of action be alleged with reasonable accuracy, certainty, and clearness. *Campbell v. Welsh,* 54 Md.App. 614, 460 A.2d 76 (1983). While the Maryland Rules provide that statements in a pleading may be adopted by reference, Rule 2–303(d), they make transpicuous that each averment of a pleading shall be simple, concise, and direct. Inasmuch as the only defect alleged in count three was that of a "design defect," we decline to address the issue of the validity, *vel non,* of the claim of failure to warn. Adoption by reference is useful as a matter of convenience, but it may not be used to transform a negligence claim into one of strict liability.

## The Design Defect

The question relating to design defect may be properly stated: Was the evidence adduced by Ziegler sufficient to generate a jury issue regarding the existence of a design defect in the motorcycle?

The answer, of course, depends on what kind of evidence Ziegler was required to produce in order for the jury to determine the existence of a defect.

For the first time in this State, the Court of Appeals in *Phipps v. General Motors Corp.*, 278 Md. 337, 363 A.2d 955 (1976), adopted strict liability as a basis for a product liability action. *See Singleton v. International Harvester Co.*, 685 F.2d 112 (4th Cir.1981). *See also* Gilbert, *Maryland Tort Law Handbook*, § 12.1 (1986). Specifically adopting the elements set out in § 402A of the Restatement (Second) of Torts (1965),[7] the *Phipps* Court commented that it is a simpler matter to apply § 402A in manufacturing defect cases than in those of design defect. *Phipps*, 278 Md. at 344–45, 363 A.2d 955; *Singleton*, 685 F.2d at 114. *See also generally* Gilbert, § 12.4.1 at 112.

To recover under the authority of § 402A, a plaintiff need not prove any specific act of negligence on the part of the seller, but the plaintiff must prove that the product was in a defective condition *and* unreasonably dangerous at the time the product was sold. Gilbert, § 12.2 at 109. "Proof

---

7. Section 402A provides:
    "(1) One who sells any product in a *defective condition unreasonably dangerous* to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
        (a) the seller is engaged in the business of selling such a product, and
        (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
    (2) The rule stated in Subsection (1) applies although
        (a) the seller has exercised all possible care in the preparation and sale of his product, and
        (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

of one factor but not the other will defeat the plaintiff's claim." *Id.*

The two conditions are explained in terms of consumer expectations in the official comments to § 402A, Restatement (Second) of Torts (1965). Comment g explains that a "defective condition" is present in those situations where the "product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." Comment i defines an "unreasonably dangerous" product as one that is "dangerous to an extent beyond that which would be [the contemplation of] the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

When a defective condition is the result of an error in the manufacturing process, *i.e.*, if the product does not conform with the manufacturer's own standards, the consumer expectation test of § 402A is easier to apply. *Phipps*, 278 Md. at 344, 363 A.2d 955. Section 402A is more difficult to apply when the alleged defect "is the result of the design process so that the product causing the injury was in a condition intended by the manufacturer...." *Id.* at 344–45, 363 A.2d 955. Although the inquiry is concentrated on the product rather than the conduct of the manufacturer, in a design defect case, § 402A requires "a weighing of the utility of risk inherent in the design against the magnitude of the risk." *Phipps*, 278 Md. at 345, 363 A.2d 955. *See also Troja v. Black & Decker Mfg. Co.*, 62 Md.App. 101, 107, 488 A.2d 516 (1985). The analysis used to determine whether the defect created an unreasonable danger retains the elements of a traditional negligence inquiry. *Phipps*, 278 Md. at 345, 363 A.2d 955.

"The question of whether a product is unreasonably dangerous is a balancing process—weighing the public good against the individual occurrence." Gilbert, § 12.6 at 114. There are cases, however, where the risk is never "reasonable," and no balancing is required. *Phipps*, 278 Md. at 345–46, 363 A.2d 955; *Troja*, 62 Md.App. at 108, 488 A.2d

516. Examples of "inherently unreasonable risks" include the steering mechanism of a new automobile causing the car to swerve off the road, the drive shaft of a new automobile separating from the vehicle when it is driven in a normal manner, or where the brakes of a new automobile suddenly fail. *Phipps*, 278 Md. at 345, 363 A.2d 955. Digges and Billmyre explain that an " 'inherently unreasonable risk' type of design defect is similar to a manufacturing defect because in both the product does not function as the manufacturer intended." 16 U.Balt.L.Rev. at 13. *Phipps* held that, where an "inherently unreasonable defect" is involved, the defective condition and the unreasonably dangerous requirements are met if the condition causing the injury is not one that would be contemplated by an ordinary consumer. 278 Md. at 345–46, 363 A.2d 955. *See* Digges and Billmyre, 16 U.Balt.L.Rev. at 13.

In a design defect case that is not included in the limited category of inherently unreasonable risks, the issue turns into "whether a manufacturer, knowing the risks inherent in his product, acted reasonably in putting it on the market." [8] *Singleton*, 685 F.2d at 115. The question of the alleged defects then depends on "the balancing of the utility of the design and other factors against the magnitude of

---

**8.** Professor Wade suggested that, when the issue of lack of "due safety" (a term he preferred over "defective" or "unreasonably dangerous") is involved, the proper question for the jury's consideration is whether a product is so likely to be harmful

" 'that a reasonable prudent manufacturer [supplier], who had actual knowledge of its harmful character would not place it on the market. It is not necessary to find that this defendant had knowledge of the harmful character of the [product] in order to determine that it was not duly safe.' This language gives the tort flavor. It uses the familiar concept of a reasonable prudent man; which juries have always been able to handle; but it differentiates clearly between negligence and strict liability. It applies equally to manufacturing errors and bad designs. It is clearly objective in nature, giving no hint of depending on the subjective expectations of either party."

Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss.L.J. 825, 839–40 (1973) (footnotes omitted).

that risk." *Phipps,* 278 Md. at 348, 363 A.2d 955. *See also Troja,* 62 Md.App. at 108, 488 A.2d 516.

The risk/utility test is the measure in the case at bar, rather than the "consumer expectation test." Ziegler asserts that the risk/utility test has not been adopted in Maryland, and Kawasaki contends that the absence of a "malfunction" precludes the finding of any defect. Both parties rely on *Kelley v. R.G. Industries, Inc.,* 304 Md. 124, 497 A.2d 1143 (1985), to support their respective positions.

Since *Phipps* first approved the risk/utility test, Maryland has also adopted the balancing test for determining product defectiveness where the defect is not inherently unreasonable. *See Valk Mfg. Co. v. Radha Rangaswamy, et al.,* 74 Md.App. 304, 537 A.2d 622 (1988); *C & K Lord v. Carter,* 74 Md.App. 68, 536 A.2d 699 (1988), (Alpert, J.; Garrity, J., dissenting); *Troja,* 62 Md.App. at 109, 488 A.2d 516; *Singleton, supra. See also* Digges & Billmyre, 16 U.Balt.L.Rev. at 14.

That balancing test was also recognized in *Kelley.* There, the Court rejected the plaintiff's argument that the handgun was defective, holding that simply because a product may be dangerous does not make it defective. "For the handgun to be defective, there would have to be a problem in its manufacture or design, such as a weak or improperly placed part, that would cause it to [mis]fire or otherwise malfunction." *Id.* [304 Md.] at 136, 497 A.2d 1143. *See also* 16 U.Balt.L.Rev. at 13, n. 81. The *Kelley* Court reasoned that neither the "consumer expectation" test nor the "risk/utility" test were applicable because the injuries complained of were the result of the gun's "normal function"; nothing went "wrong" with the *product. Kelley,* 304 Md. at 136–38, 497 A.2d 1143. The "malfunction" requirement that the *Kelley* Court imposed as a prerequisite before either test is applicable must be read within the narrow context of handguns. *See C & K Lord, Inc. v. Carter* [74 Md.App.] at 85, 536 A.2d 699. It is not the "normal function" of most products, including a motorcycle,

to bring about serious injury, *see Camacho v. Honda Motor Co., Ltd.*, 741 P.2d 1240, 1247 (Colo.1987).

Yet the *absence* of a safety device may clearly be a design defect, even in a product which does not "malfunction." Professor Wade has stated: "Under [the word] design is included the failure to provide proper safety devices. Design may include the parts of elements which do or do not go into the make-up of a product, if it is intended to be in that condition." Wade, 44 Miss.L.J. 825, 841 (footnotes omitted).

It was further commented by Wade that consumer expectations do not provide guidelines fully suitable to situations involving design defects, where "the consumer would not know what to expect, because he would have no idea how safe the product could be made." *Id.* at 829. *See also Barker v. Lull Engineering Co., Inc.*, 20 Cal.3rd 413, 143 Cal.Rptr. 225, 236, 573 P.2d 443, 455 (1978).

■ As we have stated, the risk/utility test is applicable here. The failure of Kawasaki in the present case to equip the motorcycles with side impact protection is not an inherently unreasonable risk. The motorcycle operated exactly as intended by both the manufacturer and the plaintiff.[9] The defect alleged in the matter *sub judice* is not one involving a part of a motorcycle that "malfunctioned" because of either a manufacturing or a design defect. Rather, Ziegler charges unreasonableness on the part of the manufacturer, distributor, and seller because they placed a product on the market without a part that would function upon impact to reduce injury. One commentator has aptly stated, "The most important aspect of the design defect is that it is the result of a conscious and voluntary choice of

---

9. Ziegler was an experienced motorcyclist, and the motorcycle at issue in this case was his third one. He testified at trial that he was aware that accidents could occur while riding a motorcycle, and that was the reason for his wearing a helmet.

the form of quality of the product. The result of such a defect is that the plaintiff is injured while using the product in its ordinary and intended manner." [10] Comment, *Foreseeability in Product Design and Duty to Warn Cases—Distinctions and Misconceptions,* 1 Wis.L.Rev. 228, 231 (1968). *See also C & K Lord* [74 Md.App.] at 85, 536 A.2d 699. The risk/utility test is therefore the only appropriate test to be applied in the instant case because it allows "full consideration of the relative merits of a product design." Digges & Billmyre, 16 U.Balt.L.Rev. at 16. *See also C & K Lord,* at 85, 536 A.2d 699, and *see Shehan v. Anthony Pools,* 295 Md. 285, 455 A.2d 434 (1983).

The factors to be considered under the risk/utility test are:

"(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

---

**10.** This Court has recognized that "accidents *are* part of driving." *Lahocki v. Contee Sand & Gravel Co.,* 41 Md.App. 574, 581, 398 A.2d 490 (1979) (emphasis in original); *Volkswagen of America v. Young,* 272 Md. 201, 321 A.2d 737 (1974).

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance."

Wade, 44 Miss.L.J. 825, 837–38. *See also Troja,* 62 Md. App. at 108, 488 A.2d 516.

In order to create a jury issue on Kawasaki's liability for a defective design, Ziegler was required but failed to produce evidence showing

"the technological feasibility of manufacturing a product with the suggested safety device at the time the suspect product was manufactured; the availability of the materials required; the cost of production of the suggested device; price to the consumer, including that of the suggested device; and the chances of consumer acceptance of a model incorporating such features."

*Troja,* 62 Md.App. at 104, 488 A.2d 516.

Dr. Arthur Ezra, Ziegler's expert in "injury-producing mechanisms in motorcycle crashes," testified that Ziegler's "injuries would have been greatly reduced, if not avoided, had a properly designed crash bar or leg protection been present." The doctor informed the jury that, although the use of "robust" crash bars would have been effective in reducing the severity of the plaintiff's injury at 30 miles per hour, if the accident had occurred at a different angle and at a higher speed the use of crash bars would not have helped Ziegler.

To support his opinion that Ziegler's leg injuries would have been greatly lessened if his motorcycle had been equipped with robust crash bars, Dr. Ezra relied on a test designated as "A3–14" which showed, according to him, that "the crash bar prevents the bike from rotating into the car and trapping the legs." The actual report on test A3–14, however, revealed that the impact of the rider's leg with the crash bar "severed the ankle by rupturing the weld at the ankle point." Additional expert testimony concerning test A3–14 disclosed that the operator's foot was cut off on impact. From that testimony the jury could have inferred that the cure was worse than the injury.

When later confronted with a report stating that "severe leg impacts occurred either because of, or in spite of, robust crash bars," Dr. Ezra abandoned his strong advocacy of robust crash bars and stated that he would not advocate crash bars because "reinforced fairings" [11] are better. Although the doctor testified that the latter type of protective device had been successfully tested, the test results indicated that "the dummy would have had a broken neck ... and the left arm of the dummy was completely rotated at the shoulder."

Expert opinion has "no greater value than the facts on which it is based," *Bernstein v. Reforzo*, 37 Md.App. 724, 379 A.2d 181 (1977). Dr. Ezra's testimony that a safer and practicable alternative design was available was not convincing. In sum, the evidence was insufficient to advance Ziegler's allegations of a defective design beyond the realm of sheer speculation. *See Montgomery Ward & Co. v. McFarland*, 21 Md.App. 501, 515–16, 319 A.2d 824 (1974).

The testimony offered by Bruce Enz, another expert retained by Ziegler, was equally speculative and similarly unconvincing. Enz related to the jury that the injury to Ziegler's leg would have been less severe had the motorcycle been equipped with a robust crash bar, but he admitted that it was "certainly possible" to have a fractured leg "from the leg['s] hitting the [crash] bar rather than the car['s] crushing the leg." Enz's testimony was as unavailing as Dr. Ezra's with respect to other injuries which might have been sustained by Ziegler had a robust crash bar been in place on the motorcycle. On the other hand, Kawasaki's expert witnesses testified and illustrated what would have happened to Ziegler in the way of total injuries had the motorcycle been equipped with the protective device. The

---

**11.** A "reinforced fairing" is a "fairing" that is reinforced by a crash bar. A fairing is a kind of "shroud." Dr. Ezra explained, "The principle of a reinforced fairing is that you are burying your reinforced crash bar inside that. You have padding in front to cushion your leg's hitting it and you have the structure to give it the strength."

Kawasaki experts informed the jury that paralysis or death would have been the likely result.

■ There was, we think, insufficient credible evidence produced at trial to show that the absence of a robust crash bar or other protective device constituted a design defect on the Kawasaki motorcycle. The evidence viewed in the light most favorable to Ziegler,[12] fails to pass muster in that there was not sufficient evidence that the injuries sustained would have been lessened because of the presence of a protective device. Indeed, the overwhelming evidence was to the contrary. Even if we were to assume, *arguendo*, that the evidence was sufficient to create a *prima facie* case insofar as the leg injury, standing alone, was concerned, that evidence would not be sufficient to permit an inference that a motorcycle with robust leg bars would be safer with respect to the rest of the operator's body. One cannot eliminate the risk of injury to the leg at the expense of a significantly increasing risk of injury to other parts of the body. Phrased differently, Ziegler failed to produce evidence that the design alternative would meet the need and still permit the whole body to be safe. Having not satisfied the "risk" part of the two-fold risk/utility test, Ziegler fell short of producing sufficient evidence for the jury to make a determination regarding Kawasaki's reasonableness *vel non* in marketing a motorcycle without protective crash bars. Since the first prong of the risk test was not sated, we need not address other factors involved in the "utility" test.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

---

**12.** In *Impala Platinum, Ltd. v. Impala Sales (USA), Inc.,* 283 Md. 296, 327, 389 A.2d 887 (1978), the Court of Appeals said:
"The general rule by which the sufficiency of the evidence is to be tested on appellate review is the same for a judgment n.o.v. and a ... [motion for judgment]. The evidence and the reasonable inferences to be drawn from it are to be considered in the light most favorable to the party opposing the motion."