608 A.2d 1276

**Joseph W. KLEIN, et ux.,**

**v.**

**SEARS, ROEBUCK AND CO., et al.**

**No. 1539, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

July 7, 1992.

478

Raymond S. Butler, Baltimore, argued (Bertram M. Goldstein, Goldstein, Hood & Associates, Baltimore, and Joseph A. Miklasz, Glen Burnie, on the brief), for appellants.

James A. Rothschild, Baltimore, argued (Philip C. Jacobson and Anderson, Coe & King, on the brief) for appellees.

Argued before BLOOM, ROSALYN B. BELL and FISCHER, JJ.

BLOOM, Judge.

Appellant Joseph W. Klein purchased from appellee Sears, Roebuck and Company, Incorporated, a 10–inch radial arm saw that had been manufactured for Sears by appellee Emerson Electric Company, Incorporated (Emerson).  Several months later, while Klein was using the saw,

four fingers of his left hand were amputated by the saw blade.

Klein brought an action in the Circuit Court for Anne Arundel County against Sears and Emerson, seeking to recover compensatory and punitive damages for breach of warranty and strict liability in tort. His wife, appellant Edythe M. Klein, joined in the action to assert a joint claim for loss of consortium. Upon appellees' motion, the court dismissed three counts of appellants' four count second amended complaint: Count 2, for breach of warranty; Count 3, loss of consortium, and Count 4, for punitive damages. The case then proceeded to trial before a jury on the first count, which asserted a claim for strict liability, based upon allegations that the absence of a lower blade guard was a design defect making the saw unreasonably dangerous.

The first witness for the plaintiff was Mr. Klein himself. Through him, five exhibits (the saw, the saw table, his receipt for the purchase of the saw, the owner's manual that came with the saw, and a diagram of the garage in which he was working at the time of the injury) were introduced in evidence. During the course of his testimony, Mr. Klein demonstrated what he was doing and how he was using the saw at the time he was hurt. At the conclusion of Klein's testimony on direct examination, appellees moved for summary judgment, which the court eventually granted after hearing extensive argument.

Final judgment for appellees was entered on 29 July 1991, and appellants noted an appeal therefrom on 8 August. On 16 August, appellants filed a post judgment motion to alter or amend the judgment.[1] The court ruled that because of the appeal it had no jurisdiction to entertain the post judgment motion. Appellants, uncertain as to when the judg-

---

1. Although the motion purportedly was filed pursuant to Md. Rule 2-534, it was actually filed in accordance with Rule 2-535, since it was filed more than 10 but less than 30 days after entry of judgment.

ment became final, filed a second appeal to insure that they would have their day before this Court.

Appellants assert that the trial court erred:

1.  in granting appellees' motion for summary judgment after conclusion of the direct examination of Joseph W. Klein, as there was a genuine issue of material fact as to appellants' theory of liability;

2.  in denying appellants' motion to alter or amend the judgment to include proffers of witnesses excluded from testifying as a result of the summary judgment granted in favor of appellees; and

3.  in granting appellees' motion to dismiss appellants' loss of consortium claim.

We agree with the first and third contentions; accordingly, we shall reverse the judgment of the circuit court.

### Facts

Joseph W. Klein was 35 years old at the time of his injury. When he was 8 or 9 years of age, he began working in the field of carpentry on Saturdays and summers with his father and grandfather. From 1981 through 1985 he worked as a handyman and carpentry subcontractor in the home-building industry. On 19 November 1984, Klein purchased a partially assembled 10–inch Sears Craftsman radial arm saw from a Sears branch store to use in his business. Klein had never used a radial saw to make a ripcut,[2] but had seen a radial saw being used and was impressed with the number of different types of cuts the saw could make.

Upon reading the owner's manual, Klein became aware that a lower retractable blade guard was available as an optional item, but, according to the manual, it was for use only in making 90 degree angle crosscuts. Klein found no reference in the manual for any optional blade guard to be used for ripcuts. After reading the entire Sears owner's manual, a 42–page booklet, he assembled the saw. Since he

---

**2.** Ripcutting is cutting a board along its length, with the grain.

intended to use the saw for heavy duty commercial work, he rewired it to operate on 240 volt current, in accordance with the manual.

A radial arm saw consists of a rectangular shaped metal frame that supports a rear column. A wooden table sits on the frame. The column holds a metal arm that extends out over the table from back to front. On the arm are the saw blade and motor, which can be positioned along the arm and locked into place. The on/off switch is on the end of the arm. A wooden fence, parallel with the front and back of the saw table, must be used in making all cuts, crosscuts, bevel cuts, and miter cuts. In crosscutting, the blade moves freely back and forth, perpendicular to the fence; in ripcutting, the blade is locked into position, parallel to the fence, at the desired distance from the fence. In ripcutting, a board is fed (pushed) into the saw blade from the in-feed side (the side on which the teeth of the blade rotate downward into the board being cut).

In late May of 1985, Klein got a job as a subcontractor for Bayshore Homes, installing siding and trim on new houses. Klein's wife, Edythe, and his brother, David, worked with him on the job. On 14 June 1985, Klein was operating the saw inside the garage of a house under construction, the concrete floor of which provided a smooth, level surface. He used the saw only for ripcutting boards, all of the same width. Klein used two stands known as "deadmen." One stand was positioned six to eight feet to the front of the in-feed side of the saw blade and the other was positioned about the same distance from the out-feed side of the saw blade. Klein was ripping 12–inch wide ⁵⁄₄ thickness cedar boards, each 12 to 14 feet long (the stock lumber), into trim boards 3 and ³⁄₄ inches wide. The "deadmen" stands supported the long boards as they were fed into and out of the saw blade. After the boards were cut down to trim size width, they were crosscut to proper lengths with a hand held circular saw. Appellant's wife and his brother would then nail them to the building.

Klein intended to cut 10 to 20 pieces of trim board; he had cut nine of them at the time of the accident. Klein had just finished cutting a piece of trim board, so there was a finished trim board and the remains of the stock lumber, a piece of scrap, on the saw table. Leaving the saw on, with the blade rotating, he took the scrap piece off the table and discarded it. He then returned to the saw, took the finished trim board off the saw table, and placed it by the side wall of the garage, approximately 8 feet from the saw. He then walked to the back of the garage, approximately 18 feet from the saw, picked up an uncut 14–foot board, and brought it over to the saw. Standing on the in-feed side of the saw table, Klein placed the board on the deadman. The saw was still running. As Klein started to slide the board back to get it in position to run through the saw, his eyes were primarily focused on the deadman behind him, away from the saw blade. It was then that Klein heard a pinging sound, looked down, and saw that the four fingers of his left hand had been sliced off. He immediately shut the saw off and called to his brother for help.

### Summary Judgment

The standard for granting summary judgment is:

If there is a genuine dispute as to any material fact, then it should not be granted. In reviewing such a motion we must be concerned primarily with deciding whether or not a factual issue exists. Therefore, all inferences should be resolved against the party making the motion. However, when the moving party has set forth sufficient grounds for summary judgment, the party opposing the motion must show with some precision that there is a genuine dispute as to a material fact.

*Rooney v. Statewide Plumbing*, 265 Md. 559, 563, 290 A.2d 496 (1972). *See also*, Md.Rule 2–501. Facts are material if their resolution will affect the outcome of the case. *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985).

[E]ven where the underlying facts are undisputed, if those facts are susceptible of more than one permissible

inference, the choice between those inferences should not be made as a matter of law, but should be submitted to the trier of fact.

*Fenwick Motor Co. v. Fenwick*, 258 Md. 134, 138, 265 A.2d 256 (1970). A motion for summary judgment may be made at any stage of the proceedings. *Placido v. Citizens Bank & Trust Co.*, 38 Md.App. 33, 41, 379 A.2d 773 (1977). "Unnecessary use of judicial time need not be continued merely because it had earlier been expended." *Id.*

Our concern in reviewing the propriety of the trial court's action in granting appellees' motion is whether there was a dispute as to a material fact and, if not, whether the moving party was entitled to judgment as a matter of law. *Syme v. Marks Rentals, Inc.*, 70 Md.App. 235, 238, 520 A.2d 1110 (1987).

## Design Defect

Appellants assert that appellees are liable for Mr. Klein's injury because the Craftsman 10–inch radial saw that removed his fingers was defective in design. The alleged defect was the lack of a lower blade guard, a safety feature that would have prevented Klein's hand from coming in contact with the revolving saw blade.

The Court of Appeals adopted strict liability as a basis for product liability in *Phipps v. General Motors Corp.*, 278 Md. 337, 363 A.2d 955 (1976). In so doing, the Court specifically adopted the elements of the tort as set out in § 402A of Restatement (Second) of Torts (1965). For a detailed explanation, *see Ziegler v. Kawasaki Heavy Industries, Ltd.*, 74 Md.App. 613, 539 A.2d 701 (1988), *cert. denied*, 313 Md. 32, 542 A.2d 858 (1988), and *Troja v. Black & Decker Mfg. Co.*, 62 Md.App. 101, 488 A.2d 516, *cert. denied*, 303 Md. 471, 494 A.2d 939 (1985). *See also* Gilbert, *Maryland Tort Law Handbook*, § 12.1 (1986). Basically, to recover in a strict liability case, a plaintiff need not prove any specific act of negligence; he must merely prove that the product was in a defective condition *and* unreasonably

dangerous at the time it was sold. The defect may be one that occurred in the manufacturing process, in which case the product does not conform to the manufacturer's own standards, or it may be a defect in design, in which case what proves to be a defect was actually intended by the manufacturer. With respect to the former, the focus is on the conduct of the manufacturer; with respect to the latter, the inquiry focuses on the product itself.

In a design defect case, Restatement § 402A requires "a weighing of the utility risk inherent in the design against the magnitude of the risk." *Phipps,* 278 Md. at 345, 363 A.2d 955; *quoted in Ziegler,* 74 Md.App. at 620, 539 A.2d 701. In some cases, the risk is never reasonable, so no balancing in required. Examples of "inherently unreasonable risks," pointed out in *Phipps,* 278 Md. at 345, 363 A.2d 955, would be a steering mechanism of a new car that causes the vehicle to swerve off the road, the drive shaft of a new automobile separating from the vehicle while it is being driven in a normal manner, or a sudden failure of the brakes on a new automobile. Such defects are akin to manufacturing defects in that the product does not function as the manufacturer intended. E.S. Digges & T.J. Billmyre, *Product Liability in Maryland: Traditional and Emerging Theories of Recovery and Defense,* 16 U.Balt.L.Rev. 1, 13 (1986).

In a design defect case, such as the one *sub judice,* that is not in the "inherently unreasonable risk" category, the question is "whether a manufacturer, knowing the risks inherent in his product, acted reasonably in putting it on the market." *Ziegler,* 74 Md.App. at 621, 539 A.2d 701, quoting *Singleton v. International Harvester Co.,* 685 F.2d 112, 115 (4th Cir.1981). A determination as to whether it was reasonable to put a product on the market involves balancing "the utility of the design and other factors against the magnitude of that risk." *Phipps,* 278 Md. at 348, 363 A.2d 955. *See also Ziegler,* 74 Md.App. at 621–22, 539 A.2d 701; *Troja,* 62 Md.App. at 108, 488 A.2d 516.

**486**

In *Ziegler*, the late Chief Judge Gilbert, writing for this Court, explained that the absence of a safety device may clearly be a design defect, even in a product that does not "malfunction." 74 Md.App. at 623, 539 A.2d 701. The result of such a defect is that the plaintiff is injured while using the product in its ordinary and intended manner. The risk/utility test, because it allows full consideration of the relative merits of a product design, is the only appropriate test to be applied in cases such as this one. The factors to be considered under that test are:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Ziegler*, 74 Md.App. at 624–25, 539 A.2d 701, quoting Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss.L.J. 825, 837–38. *See also Troja*, 62 Md.App. at 108, 488 A.2d 516.

Appellants were prepared to show that Sears sells a 12-inch radial arm saw with an attached lower blade guard. It is primarily intended for heavy duty commercial or industri-

al use, and with the lower blade guard affixed it is used for ripcutting as well as crosscutting. OSHA requires that the saw be equipped with an attached blade guard and that it be used with the blade guard. Appellants' claim of design defect is based upon the proposition that it is equally feasible to equip the 10–inch radial arm saw, which is advertised as suitable for commercial use as well as for use by home craftsmen, with a lower blade guard. Considering the importance OSHA attached to this simple, feasible safety device, appellants contend, it was unreasonable to omit it. Appellants claim that a lower blade guard would have prevented the injury to Mr. Klein and, indeed, is designed to prevent just such injuries, which occur as a result of occasional momentary lapses of attention or concentration that may befall anyone and thus must be anticipated.

The defense to the strict liability claim that was raised by appellees in their motion for summary judgment was based upon the proposition that with or without additional safety features their 10–inch radial arm saw presents obvious hazards if handled improperly but is not unreasonably dangerous if used with care and in accordance with appellees' warnings and instructions. They rely upon *Simpson v. Standard Container Company,* 72 Md.App. 199, 527 A.2d 1337, *cert. denied,* 311 Md. 286, 533 A.2d 1308 (1987), in which this Court held that misuse of the product and failure to read or follow the product's warnings and instructions are defenses to strict product liability.

Appellees' reliance on *Simpson* is misplaced. In that case, Ramesh Oza, a neighbor of the Simpsons, purchased from K–Mart a new 1 and ½ gallon gasoline can manufactured by Standard Container Company. He filled the can with gasoline, used it once, and then stored the can on his basement floor. Some time thereafter, four-year-old Lorenzo Simpson Jr. visited the Oza house to play with four-year-old Summit Oza. The children went into the basement, unscrewed the cap from the gasoline can, and spilled gasoline on the floor. The gasoline vapors ignited, fatally burning the Oza child and severely injuring the Simpson

child. The product liability claim against the manufacturer and seller of the can was based upon the theory that the can was unreasonably dangerous and thus defective in that it lacked a child-proof cap. On the basis of the pleadings and certain proffers, including photographs of the four vertical sides of the can, the Circuit Court for Baltimore City dismissed the complaint. We affirmed, basing our decision both on the theory of misuse (*see Ellsworth v. Sherne Lingerie, Inc.*, 303 Md. 581, 596, 495 A.2d 348 (1985)) and on Comment j to § 402A of the Restatement (Second) of Torts, which states:

> Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in a defective condition, nor is it unreasonably dangerous.

The gasoline can had warnings on two of its four sides proclaiming, "Keep Out of Reach of Children" and "Do Not Store in Vehicle or Living Space." Unquestionably, had those warnings been heeded the can would have been safe for its intended use.

Attempting to bring their case within the holding of *Simpson,* appellees pointed to warnings and instructions on the saw itself and in the owner's manual, which Mr. Klein acknowledged that he had received and read before using the saw, that would have made the saw safe for its intended use had they been heeded:

—NEVER LEAVE TOOL RUNNING UNATTENDED. Turn power off. Do not leave tool until it comes to a complete stop. [Instruction No. 22.]

—MINIMIZE ACCIDENT POTENTIAL [heading on page three of the manual followed by specific instructions for avoiding accidents, including]:

> Avoid awkward hand positions where a sudden slip could cause a hand to move into the saw blade or other cutting tool. Never reach in back or around the cutting tool with either hand to hold down the

work piece for any other reason.  Do not place fingers or hands in the path of the saw blade.

.    .    .    .    .

Never leave the saw with power "ON" or before the cutting tool has come to a complete stop.  Lock the motor switch and put away the key when leaving the saw.

.    .    .    .    .

DO NOT perform layout, assembly, or set up work while the cutting tool is rotating.

—[Warning on the top blade guard, at the out-feed side] DANGER, TO AVOID INJURY, DO NOT FEED MATERIAL INTO THE TOOL AT THIS END.

—[Warning on the saw motor] DANGER FOR YOUR OWN SAFETY [followed by nine warnings, including] NEVER REACH AROUND THE SAW BLADE [No. 6].

Appellees asserted that Mr. Klein disregarded the warnings and instructions pertaining to not having the saw running while not actually cutting, *i.e.*, leaving the saw running unattended, leaving the saw with power on before it came to a complete stop, and performing layout, assembly, or setup work with the blade running.  They also asserted that he disregarded or failed to heed instructions pertaining to putting his hands near the out-feed side of the rotary blade, *i.e.*, reaching in back or around the moving blade.

■    What appellees (and the trial court) failed to appreciate is that although the warnings and instructions on the gasoline can in the *Simpson* case were clear, direct, simple, unequivocal, unmistakable, definite, and easy to understand and obey, the meanings of the warnings and instructions on the saw and in the owner's manual are too general to be unmistakable or undebatable.

The parties disagree as to what the warnings or instructions about not leaving the tool running unattended, turning

the power off, never leaving the saw with power on, mean. Appellants insist that those instructions do not mean that the saw motor should be turned off and the key put away after each cut. Nor do they agree as to the meanings of the warnings or instructions about keeping one's hands away from the blade while it is in motion, about not reaching around the blade, and about avoiding awkward hand positions. Questions are raised as to how far away from the blade one must always keep one's hands. What constitutes an awkward hand position? What is meant by the instruction about reaching around the blade? Appellees contend but appellants deny that Mr. Klein, contrary to the warnings and instructions, was performing layout, assembly, or setup work when he was injured. It is arguable that the instructions are so general that they really mean nothing more than "be careful not to run your hand into the rotating blade" while ripcutting and "be careful not to pull the rotating saw blade into your hand" while crosscutting. If so, they are far too general to justify reliance in this case upon the holding in *Simpson*, because reasonable minds may differ as to whether the existence of such warnings, if heeded, would make the saw safe for its intended use. There can be no doubt about what conduct would constitute either heeding or disregarding the warnings on the gasoline can in *Simpson;* it is not so clear exactly what conduct would constitute compliance with the warnings on appellees' saw and in their owner's manual.

Mr. Klein testified that he believed he was not leaving the saw unattended while moving about the garage as he ripcut the large boards down to trim size. The proffered testimony of appellants' expert, Dr. Keith, supports this position. It was submitted that Dr. Keith would have testified that it was not the custom of the trade to turn off the saw during repetitive ripcutting. Further, it was submitted that the manner in which Mr. Klein testified he was using the saw (placing the finished board within its designated place within the garage, retrieving a new work piece form its designated place several feet from the saw in the garage, and

returning to the saw table) was not leaving the saw unattended with the motor running, as proscribed by the owner's manual.

Dr. Keith also would have testified that Mr. Klein was not performing layout, assembly, or setup work and did not violate any instructions or warnings pertaining to positioning himself properly while operating the saw.

■ In sum, the evidence presented to the trial court, together with the proffered testimony of Dr. Keith and reasonable inferences that might be drawn from that testimony, generated a genuine issue of material fact as to whether Mr. Klein was operating the saw in accordance with the owner's manual or in disregard of the warnings and instructions contained in the manual and on the saw. Accordingly, summary judgment was improper; it was for the trier of fact to resolve the factual issues.

Since we agree with appellants that the court erred in granting summary judgment, it is unnecessary for us to address appellants' second contention, regarding their motion to alter or amend the judgment so that they might include in the record proffers of witnesses excluded from testifying.

### *Loss of Consortium*

Appellants also contend that the trial court erred in granting appellees' motion to dismiss appellants' loss of consortium claim.

Appellants dismissed the claim for negligence in their second amended complaint and proceeded to trial solely on the theory of strict liability. Count three of the second amended complaint asserted a claim for loss of consortium. Appellees moved to dismiss the loss of consortium claim under strict liability, relying on *Doe v. Miles Laboratories, Inc.*, 675 F.Supp. 1466 (D.Md.1987), *aff'd*, 927 F.2d 187 (4th Cir.1991). The trial court granted appellees' motion and dismissed the loss of consortium claim.

In *Doe,* a patient who had contracted AIDS related complex, after blood-coagulation-factor concentrate was administered during emergency medical treatment, brought suit in the United States District Court for the District of Maryland against the concentrate producer, asserting claims for strict liability in tort and breach of warranties. The patient's husband additionally asserted a claim for loss of consortium. The producer's motion for summary judgment on the breach of warranties claim was granted, and on its motion for summary judgment on the loss of consortium claim, the Court granted the motion on the theory that "strict products liability focuses on the character of the product and not the conduct of the manufacturer" whereas recovery for loss of consortium focuses on the fact that "fault [has been] found on the part of the defendant, based either on negligent or intentional misconduct...." *Doe,* 675 F.Supp. at 1481.

> A loss of consortium action is a remedy for an injury to the marital entity. *Deems v. Western Maryland Ry.,* 247 Md. 95, 231 A.2d 514 (1967). Loss of consortium includes the loss of society, affection, assistance, and conjugal fellowship. It encompasses more than the loss or impairment of sexual relations. *MacCubbin v. Wallace,* 42 Md.App. 325, 327, 400 A.2d 461, *cert. denied,* 285 Md. 732 (1979).

*Exxon Corp. v. Schoene,* 67 Md.App. 412, 423, 508 A.2d 142 (1986).

■ Maryland's view of strict liability in tort for injuries caused by a dangerous and defective product is that such tort is akin to negligence. "Thus, the theory of strict liability is not a radical departure from traditional tort concepts." *Phipps, supra,* 278 Md. at 351, 363 A.2d 955. As the Court of Appeals noted in *Phipps,* "the major distinction between an action in strict liability in tort and one founded on traditional negligence theory relates to the proof which must be presented by the plaintiff." *Id.* at 350–51, 363 A.2d 955.

It is clear that Maryland espoused the doctrine of strict liability in tort in order to relieve plaintiffs of the burden of proving specific acts of negligence by permitting negligence to be implied where plaintiffs can prove a product is defective and unreasonably dangerous when placed in the stream of commerce.

*Nissen Corp. v. Miller*, 323 Md. 613, 624, 594 A.2d 564 (1991).

■■■■ When a physical injury results to a married person as a result of someone else's tortious conduct, two injuries may arise: (1) the physical injury to the spouse who was directly injured by the tortious conduct and (2) the derivative loss of society, affection, assistance, and conjugal fellowship to his or her spouse.

> That both spouses suffer when the marriage relationship is adversely affected by physical injury to either is a fact evidenced, if not by logic, by human experience since the institution of marriage became a basic part of our mores. If the husband is the one injured, it is not only the wife who is affected by reason of any resulting change of the husband's personality or ability to engage in all the intangible associations which marriage brings; he too suffers the effect of the change, if only in reaction to his wife's unhappiness.

*Deems*, 247 Md. at 108–09, 231 A.2d 514. Recovery for loss of consortium does not rest upon the nature of the underlying action. It is not confined to torts based on negligence or deliberate wrongdoing. In *Phipps*, the Court of Appeals held:

> A joint action for loss of consortium may be maintained when a breach of warranty is alleged under § 2–318 of the Commercial Code. And whatever limitation on the measure of damages may have been intended when the Legislature required that a third party beneficiary be "injured in person," we do not believe that it was intended to prevent recovery for such uniquely personal injuries as loss of consortium which traditionally were recoverable in a personal injury action.

*Phipps,* 278 Md. at 356, 363 A.2d 955. The distinction drawn by the Federal District Court in *Doe,* therefore, is contrary to Maryland law. If a claim for loss of consortium may be maintained in a breach of warranty case, which has its roots in contract law and does not depend upon proof of fault, it must surely be maintainable in an action of strict liability in tort, which is distinguishable from a traditional negligence action only with respect to the proof required of the plaintiff.

Accordingly, we reject the reasoning of the District Court in *Doe v. Miles Laboratories* and hold that a claim for loss of consortium may be maintained when brought under a theory of strict products liability. The circuit court erred in dismissing the loss of consortium count in appellants' second amended complaint.

JUDGMENT REVERSED AND CASE REMANDED FOR FURTHER PROCEEDINGS.

COSTS TO BE PAID BY APPELLEES.