UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

—————————

No. 88-3811
(CA-82-3431-HAR, et al)

—————————

Mildred A. Shetterly, etc., et al,

Plaintiffs - Appellants,

versus

Raymark Industries, Incorporated,

Defendant - Appellee.

—————————

O R D E R

—————————

The Court amends its opinion filed July 1, 1997, as follows:

On the cover sheet, section 3, line 3 -- "Frederic N. Smalkin, District Judge" is corrected to read "Alexander Harvey II, Senior District Judge."

For the Court - By Direction

/s/ Patricia S. Connor
                                    —————————
                                    Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS

# FOR THE FOURTH CIRCUIT

MILDRED A. SHETTERLY, Personal
Representative for the Estate of
William Bernard Shetterly,
deceased; LISA SHETTERLY; CHARLES
GRIFFITH; JEAN BETH GRIFFITH;
EDWARD SWORDS; IRENE SWORDS;
GEORGE DIXON SMITH; ROSALIE A.
SMITH; GEORGE J. SKLERES; DIMITRA
SKLERES; LAMONT THOMPSON,

No. 88-3811

Personal Representative for the
Estate of Edward Dickson,
deceased; MARTHA SMITH; ARTHUR
DRAGER, as guardian for James
Weldon Smith, a disabled person,
Plaintiffs-Appellants,

v.

RAYMARK INDUSTRIES, INCORPORATED,
Defendant-Appellee.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Alexander Harvey II, Senior District Judge.
(CA-82-3431-HAR, CA-82-3154-HAR, CA-80-2612-S,
CA-83-857-HAR, CA-80-2613-K)

Argued: April 9, 1997

Decided: July 1, 1997

Before HALL and MURNAGHAN, Circuit Judges, and
BUTZNER, Senior Circuit Judge.

_____

Reversed in part and affirmed in part by published opinion. Judge Murnaghan wrote the opinion, in which Judge Hall and Senior Judge Butzner joined.

---

**COUNSEL**

**ARGUED:** Harry Goldman, Jr., GOLDMAN & SKEEN, P.A., Baltimore, Maryland, for Appellants. Susan Macdonald Glenn, NELSON, MULLINS, RILEY & SCARBOROUGH, Columbia, South Carolina, for Appellee. **ON BRIEF:** David M. Layton, Steven G. Warm, GOLDMAN & SKEEN, P.A., Baltimore, Maryland, for Appellants. T. Harold Pinkley, PAINE, SWINEY & TARWATER, Knoxville, Tennessee; Stephen A. Hudgins, HUBBARD, SMITH & HUDGINS, Newport News, Virginia, for Appellee.

---

**OPINION**

MURNAGHAN, Circuit Judge:

Plaintiffs are former employees, or representatives of former employees, of Bethlehem Steel Corporation's Key Highway Shipyard ("Key Highway"). They allege that they suffered asbestos-related illnesses from their exposure to asbestos while working at Key Highway. They are suing Raymark Industries, the manufacturer of asbestos products which were used at the shipyard. The district court granted a directed verdict to Raymark Industries at the close of Plaintiffs' case finding that there was insufficient evidence of identification and exposure to Raymark's products. In addition, the district court granted directed verdicts on all claims for loss of consortium, against the Estate of Edward Dickson for the failure to introduce into evidence Letters of Administration as proof of the existence of a personal representative, and against the guardian of James W. Smith for failure to introduce evidence appointing a guardian. After the district court's decision, Raymark Industries filed for bankruptcy, and the appeal was stayed pending the disposition of the bankruptcy proceedings.

2

Since we find that the district court erred in granting a directed verdict as to all plaintiffs, we reverse.

I. FACTS

The case arises from asbestos-related personal injuries from exposure to products which contained asbestos. Plaintiffs are all former employees, or the representatives of former employees, of Bethlehem Steel Corporation. Bethlehem Steel operated the Key Highway Shipyard in Baltimore, Maryland.

Each Plaintiff, except George Skleres, was a "bystander", someone who worked in the vicinity of the asbestos products but had no regular contact with them. George Skleres worked in the shipyard storeroom and had direct contact with asbestos.

The district court bifurcated the trial. In the first instance, the district court tried the issues of whether Plaintiffs had asbestos-related injuries and whether Plaintiffs were exposed to Raymark's product. The court reserved for the second stage of the trial the issues of negligence, strict liability and proximate cause.

A. George Skleres

Skleres worked in the storeroom at Key Highway from 1964 to 1970 and from 1972 to 1982. His position was that of a storeroom man. Skleres testified that on a regular basis he worked with asbestos blankets or cloth that came in rolls and were stored in the storeroom. When people requested asbestos cloth, Skleres measured the cloth and cut the proper amount. When the cloth was cut, asbestos fibers were released into the air. Skleres could not identify the brand of asbestos cloth used in the storeroom, but one of his coworkers, Bruce Frizzell, testified that Raybestos[1] cloth was "the main source" of cloth stored and dispensed in the storeroom.

_____

[1] Raymark Industries manufactured Raybestos which was an asbestos cloth containing 65-95% asbestos.

3

### B. George Dixon Smith

Smith worked as a laborer in the Y department. One of his duties was to clean up asbestos material, including blankets, left by other workers. Smith also worked in the rigging department. He testified that he worked with welders and burners who constantly used asbestos blankets. He also testified that he was familiar with three of the other plaintiffs, William Shetterly, George Skleres and Edward Swords, from working near them on several occasions. Moreover, Smith indicated that he was familiar with Skleres from the storeroom and that he would go to the storeroom on occasion.

### C. Edward Swords

Swords worked from 1943 to 1981 at Key Highway. For almost the entire period, Swords worked as a shipfitter. Swords testified that he carried a piece of asbestos cloth with him and used it to kneel down upon the hot steel decks. Swords worked in the vicinity of welders and burners who used asbestos cloth.

Swords also testified that he obtained asbestos cloth from the supply room on at least eight to ten occasions. He also testified that while the workers in the storeroom were cutting the blankets he would help fold them.

### D. Charles Griffith

Griffith started as a bolter-up at Key Highway and later became a sheet metal mechanic. Griffith worked around the engine room, boiler room and pump room in the presence of insulators who were tearing off and replacing asbestos cloth. In addition, he testified that he obtained asbestos cloth and worked around asbestos cloth which was obtained from the storeroom.

### E. James Weldon Smith

James Smith was unable to testify at trial. His wife testified that he was a welder in the shipyard and that his clothes were often covered with dust. Ocam Gray, another welder at Key Highway, testified that

4

he worked with James Smith approximately 40 percent of the time. He stated that Smith's exposure to asbestos would be of a similar magnitude to his own. Gray also testified that he used asbestos blankets "every day practically. That it was a way of life in the shipyard."

F. William Shetterly

Shetterly was deceased at the time of trial and testified through his daughter. She testified that his clothes were often covered with a white powder and patched with asbestos cloth. In addition, Dr. Grace Ziem, who had taken information from Shetterly regarding his occupational history, testified that Shetterly used an asbestos blanket on a frequent basis.

Swords also testified that he knew Shetterly and worked with him many times, and Griffith testified that he knew Shetterly and knew he worked as a burner around insulation.

G. Non-claimant Testimony

Several non-claimant witnesses testified about the extent to which Raybestos cloth was used at the shipyard. Most notably, A. C. & S., Inc., formerly known as Armstrong Contracting and Supply, was a primary contractor for insulation work on ships at Key Highway. Raybestos supplied the majority of the asbestos cloth to A. C. & S. and by 1967 Raymark was A. C. & S.'s exclusive supplier of asbestos cloth.

Moreover, the evidence places each Plaintiff either in close proximity to asbestos from the storeroom or in close proximity to A. C. & S. contractors who "exclusively" used Raymark's products.

II. DISCUSSION

A. Causation

The district court determined that as a matter of law there was insufficient evidence to show the necessary causation between claimants' exposure to Raymark asbestos cloth and their asbestos-related

5

injuries. However, Maryland law has been clarified since the present case was originally litigated in 1988, and the clarification requires us to reverse the district court.

In order to sustain an action against Raymark for asbestos related injuries, Plaintiffs must prove that Raymark products "were a substantial causative factor" in their injuries. Owens-Corning Fiberglas Corp. v. Garret, 682 A.2d 1143, 1156 (Md. 1996). The Court of Appeals has determined that substantial causation may be determined by examining the frequency, regularity and proximity of plaintiffs' exposure to the particular asbestos product. Id.

> Whether the exposure of any given bystander to any particular supplier's product will be legally sufficient to permit a finding of substantial-factor causation is fact specific to each case. The finding involves the interrelationship between the use of a defendant's product at the workplace and the activities of the plaintiff at the workplace. This requires an understanding of the physical characteristics of the workplace and of the relationship between the activities of the direct users of the product and bystander plaintiff. Within that context, the factors to be evaluated include the nature of the product, the frequency of its use, the proximity, in distance and in time, of a plaintiff to the use of a product, and the regularity of the exposure of that plaintiff to the use of that product. In addition, trial courts must consider the evidence presented as to medical causation of the plaintiff's particular disease.

Owens-Corning, 682 A.2d at 1156 (citing Eagle-Picher v. Balbos, 604 A.2d 445 (Md. 1992)).

Owens-Corning is particularly relevant to the present case because plaintiffs in Owens-Corning were also trying to show indirect exposure to asbestos. In Owens-Corning, the court applied the frequency, regularity, and proximity test and refused to dismiss the plaintiff's claim for lack of causation finding that the jury could infer causation.

The plaintiff in Owens-Corning could only show exposure by inference. He proved that a specific brand of asbestos product was

6

present at the plant. The specific dates that the product was used were unclear but the court determined that "a jury could infer that [company product] was used during the relevant time period." Id. at 1157, n. 9. One witness placed the plaintiff in proximity to asbestos work and that same witness identified that a specific asbestos brand product was used at the work site. Id. The court held that the jury could reasonably infer that the specific asbestos product was frequently and regularly used at the plant during the relevant time period. Id. It also held that testimony that the plaintiff worked in close proximity to asbestos work was sufficient to support the proximity requirement of the test. Id.

Applying Owens-Corning to the present case, the district court clearly erred in ordering a directed verdict. A directed verdict is only proper when "there can be but one reasonable conclusion as to the verdict." Alevromagiros v. Hechinger Co., 933 F.2d 417, 420 (4th Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)). In reviewing the district court's decision, we view the evidence in the light most favorable to the non-moving party. Alevromagiros, 993 F.2d at 420. Taking the evidence in the light most favorable to the Plaintiffs, the jury could have found that Raybestos was a substantial factor in their injuries.

George Skleres worked in the storeroom and cut asbestos cloth. In addition, there was evidence in the record that Raybestos cloth was in the storeroom and that huge quantities of the cloth were dispensed regularly. Just as in Owens Corning, Skleres can show that Raybestos was used in the plant during his period of employment, that he was in proximity to asbestos,[2] and that a specific brand of asbestos was used in the work site. In fact, in Skleres's case, there is evidence that Raybestos was the main source of asbestos cloth in the storeroom where he worked. Viewing the evidence in the light most favorable to Skleres, there is clearly enough evidence to present Skleres's case to the jury.

George Smith, Edward Swords, and Charles Griffith's claims must also be upheld on similar grounds. All three Plaintiffs indicated that they used or worked near asbestos cloth. In addition, all three testified

_____

**2** In fact, Skleres was directly involved in cutting the asbestos.

7

that they obtained asbestos cloth from the storeroom on at least several occasions. Another witness testified, and the jury could infer, that Raybestos was the main cloth used in the storeroom. Furthermore, George Smith, Swords, and Griffith all worked near A. C. & S. contractors who "exclusively" used Raymark products. Therefore, just as in Owens Corning, the jury could infer that Smith, Swords, and Griffith obtained Raybestos cloth from the storeroom and worked near Raybestos cloth at their job sites.

In fact, Skleres, Smith, Swords and Griffith may have a stronger case than that in Owens-Corning since they can show a high likelihood that they either used or worked near a specific asbestos product. They all either worked in the storeroom containing Raybestos or acquired asbestos cloth from the storeroom which "mainly" contained Raybestos. In Owens-Corning, the only evidence of a specific product being present in the work site was the testimony of a witness who stated that he saw a specific product while he worked at the company. He also testified that the plaintiff in Owens-Corning worked with him. There was no direct connection between the plaintiff and the product, but the court determined that the relationship could be inferred by the jury. Such an inference is even more likely in the instant case.

James Smith and William Shetterly's cases are much more difficult. Neither Smith nor Shetterly could testify at trial. However, there was evidence admitted that Smith's use of asbestos was similar to Gray's. Gray testified that he used asbestos cloth every day. In addition, Albert Wilder, a welder, testified that he worked around Smith and that he often worked around insulators using asbestos. If the jury inferred that Smith used asbestos cloth every day, and that Raybestos cloth was the primary cloth in the storeroom, and that Smith worked around A. C. & S. contractors who "exclusively" used Raybestos, the jury could infer that Smith was frequently exposed to Raybestos.

The same logic applies to Shetterly. Although Shetterly was deceased at the time of trial, his physician testified that in taking an occupation history of Shetterly, Shetterly told her that he used asbestos blankets on a frequent basis. In addition, Wilder testified that he worked with Shetterly quite often, and that they worked in close proximity to pipe fitters and insulators who used asbestos. Once again,

8

since Raybestos was the primary cloth in the storeroom, and since A. C. & S., a major contractor, exclusively used Raybestos, the jury might infer that Shetterly was exposed to Raybestos on a frequent basis.

In addition, there is evidence that all the Plaintiffs except Skleres worked on ships near A. C. & S. contractors. Since A. C. & S. used large quantities of Raymark products in the 60's and exclusively used Raymark's products by 1967 at the latest, the jury might properly infer that the Plaintiffs were frequently exposed to Raybestos.

Thus, in applying the frequency, regularity, and proximity test as set out in Owens-Corning, and viewing the evidence in the light most favorable to the Plaintiffs, we find that the jury could properly infer that Raybestos was a substantial cause of Plaintiffs' injuries. Therefore the district court's grant of a directed verdict was improper and we reverse.

B. Bifurcated Trial

Plaintiffs claim that the district court erred in ordering a bifurcated trial.**3** We review decisions whether to bifurcate a trial for abuse of discretion. In re Hutchinson, 5 F.3d 750, 758 (4th Cir. 1993).

The district court decided that before moving to the question of negligence, strict liability or damages, the court would first determine whether the Plaintiffs even suffered from asbestosis, whether they inhaled asbestos fibers from Raymark's products, whether the inhalation was a substantial factor in their illness, and whether each Plaintiff was entitled to any specific damages. In a complex tort case such as the one at bar, the district court has discretion to bifurcate the trial to ensure that the case is tried in an orderly fashion without confusion to the jury, and the district court did not abuse that discretion in the instant case.

───────────────────────────────────────────────────────────

**3** The Plaintiffs assert that the court trifurcated the trial. The result would be the same under either interpretation.

9

C. Lost Earnings

Plaintiffs next argue that the district court erred in refusing to grant Edward Swords and George Smith's requested instructions regarding lost earnings. The district court refused to grant such an instruction because it determined that since the Plaintiffs received a disability pension from Key Highway they could not also receive lost wages. In addition, the court determined that since the company doctor authorized disability for a heart condition not asbestosis, they could not now claim asbestosis.

Since the district court granted a directed verdict in favor of Raymark, the court never propounded a jury instruction. The issue is therefore not properly before the court.

D. Statute of Limitations

The district court directed a verdict against Mildred Shetterly, as personal representative for the estate of her husband William Shetterly, based on the expiration of Maryland's three-year statute of limitations. In the present case there was a factual dispute regarding when Shetterly became aware of the fact that he suffered from asbestosis. Shetterly argues that he became aware of his asbestosis in 1980 after he was examined by Dr. James P. Keogh. However, the district court determined that Shetterly was aware of his asbestosis in 1977 when he retired from Key Highway.

Raymark argues that under Moy v. Bell, 416 A.2d 289, cert. denied, 288 Md. 740 (1980) (the application of the statute of limitations must be made by the judge in his judicial role), the question was within the discretion of the district court. However, the Court of Appeals expressly rejected Moy in O'Hara v. Kovens, 503 A.2d 1313, 1323 (Md. 1986). In O'Hara, the Maryland Court of Appeals held that "questions of fact on which a limitations defense will turn are to be decided by the jury or, when sitting as a jury, by the court." O'Hara, 503 A.2d at 1323 (emphasis added); see also James v. Weisheit, 367 A.2d 482, 486 (Md. 1977) ("[W]hether a cause of action is barred by the statute of limitations is ordinarily a mixed question of law and fact that may be taken from the jury only when the court determines as a matter of law that a suit was not instituted within the proper time.").

10

Since in the present case there is a factual conflict as to whether Shetterly knew of his asbestosis in 1977 when he retired or in 1980 when he was diagnosed by his doctor, a directed verdict on statute of limitations grounds was improper. Under Maryland law, the jury, not the district court, should have determined whether Shetterly's claim violated the statute of limitations.

E. Loss of Consortium

The district court rejected Swords, George Smith, Skleres and Griffith's claim for lack of consortium finding that there was insufficient evidence to support the claim and finding that the claim was barred since it was not included in the pretrial order. Maryland law has been clarified regarding claims for loss of consortium since the district court rendered its decision, and in reviewing the district court's determination, we benefit from those clarifications. Upon review of Maryland law, we find the district court erred in granting a directed verdict on the loss of consortium claims.

The district court determined that the Plaintiffs failed to show any loss of consortium. In its discussion on this subject, the district court indicated that loss of sexual activity was a major part of loss of consortium and that loss of sexual activity was not proven in the present case.

> THE COURT: We are talking about loss of consortium. That is a joint claim. Are you familiar with the Maryland law, what mounts up to a loss of consortium? Number one, there was certainly no evidence of any sexual activity, and that is a large part of a claim of loss of consortium. . . .

> MR. GOLDMAN: [C]onsortium does not only include companionship and comfort. . .

> . . .

> [L]oss of services, help which one spouse renders to another, is clearly lacking by reason of physical debilitation. The recreation, going even to walk to the stream to fish in

11

the case of Griffiths. That is all companionship. They did it together. So too with all activities that normal husbands and wives enjoy if there is some physical vigor, which is lacking here.

THE COURT: How much physical vigor do you have when you're 68 or 69?

In Maryland, a loss of consortium is a remedy for an injury to the marital entity. <u>Deems v. Western Maryland Ry. Co.</u>, 231 A.2d 514 (1967). It is not just a remedy for loss or impairment of sexual relations. <u>Klein v. Sears, Roebuck and Co.</u>, 608 A.2d 1276, 1283 (Md. Ct. Spec. App. 1992). It includes the "loss of society, affection, assistance, and conjugal fellowship." <u>Id.</u>

Although there was no evidence of lack of sexual intercourse caused by asbestosis there was certainly evidence of serious physical injury. In addition, all Plaintiffs claimed that their wives depended upon them for financial assistance and that asbestosis decreased their ability to provide for their wives. Moreover, there are sufficient facts in the record to indicate that physical injury could have impacted "society, affection and assistance" if not conjugal fellowship. Moreover, Charles Griffith clearly made out a case for loss of society, affection and assistance when he claimed that he could no longer walk or fish with his wife. Companionship is as important to the marital relationship as sexual intercourse and Plaintiffs' marital relationships may have suffered due to their asbestosis.

The district court's statement "How much physical vigor do you have when you are 68 or 69?" misses the point. If the Plaintiffs have less than they would have had but for the asbestosis, they may have a claim for loss of consortium. Since this issue is before us on a directed verdict, taking the facts in the light most favorable to the Plaintiffs, there is sufficient evidence to support a claim of loss of consortium.

The district court also indicated that the Plaintiffs' claim for loss of consortium should be dismissed because the Plaintiffs did not make out such a claim in their pretrial order. Federal Rule of Civil Procedure 16(e) and Local Rule 106 provide for the entry of a pretrial

12

order. These orders should be construed liberally "to cover any of the legal or factual theories that might be embraced by their language." Trujillo v. Uniroyal Corp, 608 F.2d 815, 818 (10th Cir. 1979) (quoting Rodrigues v. Ripley Industries, Inc., 507 F.2d 782, 787 (1st Cir. 1974)); see also Lamborn v. Dittmer, 873 F.2d 522, 527 (2nd Cir. 1989); Miller v. Safeco Title Ins. Co., 758 F.2d 364, 368 (9th Cir. 1985); Howard v. Kerr Glass Mfg. Co., 699 F.2d 330, 333 (6th Cir. 1983); United States Gypsum Co. v. Schiavo Bros., Inc., 668 F.2d 172, 181 n.12 (3rd Cir. 1981), cert. denied, 456 U.S. 961 (1982); Geremia v. First Nat'l Bank of Boston, 653 F.2d 1, 5 (1st Cir. 1981).

We have reviewed the pretrial order dated September 27, 1987 and find that it sufficiently provides for a claim of loss of consortium. In regard to George and Rosalie Smith, the order states

> The plaintiffs, George Dixon Smith and Mrs. Rosalie Smith have been deprived of each others society, comfort and consortium and have sustained injury to the marital relationship as a proximate result of the husbands [sic] serious, permanent and progressive asbestos-related disease and pain, suffering and mental anguish and emotional injury and distress caused by their knowledge that his life may be shortened and that he may die as a result.

Similar language is present in the pretrial order for Charles and Jean Griffith, Edward and Irene Swords and George and Dimitra Skleres. This language in and of itself would be sufficient to support Plaintiffs' contention that they did not waive their claim to loss of consortium by failing to include it in the pretrial order.

However, even if the above language was not present in the pretrial order, Swords and Griffith specifically stated that they were not abandoning any issues which were included in their complaint. Swords and Griffith's complaints clearly make out a claim of loss of consortium, and they specifically did not abandon those claims in the pretrial order.**4**

_____

**4** The Joint Appendix only included Swords and Griffith's complaint. Under Federal Rules of Appellate Procedure 30, the Joint Appendix must contain the relevant portions of the pleadings. All of the Plaintiffs' complaints are clearly relevant to these proceedings and should have been included in the Joint Appendix.

13

F. Lack of Proof Regarding Personal Representatives

Plaintiffs' counsel failed to introduce evidence that the parties acting as representatives for Dickson and James Smith had been properly appointed as their personal representatives. The court, finding that these representatives could not be parties to the action, directed verdicts against Dickson and Smith.

Rule 17 of the Federal Rules of Civil Procedure governs a party's failure to name the proper person. Rule 17 states:

> Every action shall be prosecuted in the name of the real party in interest . . . . No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest.

The Defendants never objected to the lack of proof regarding the status of the personal representatives. The court raised the issue sua sponte. The Plaintiffs argue that once the issue was raised by the district court, they were entitled under Rule 17 to remedy the defect.

No party objected during the trial to the failure to name a proper party. The court decided sua sponte, after the close of Plaintiffs' case, that there was no proof regarding the status of the personal representative. According to the district court, Plaintiffs simply failed to prove that they were a proper party, and the district court refused to allow Plaintiffs to cure the defect.

Rule 17 specifically provides that plaintiffs should have a right to cure a defect regarding the naming of a proper party. In Lavean v. Cowels, 835 F.Supp. 375 (W.D. Mich. 1993), a district court addressed how to resolve the lack of proof regarding a personal representative's capacity to sue. In Lavean, the amended complaint did not allege how plaintiff came to be a personal representative. During the trial, defendant objected to the lack of proof that plaintiff was in fact the personal representative of the estate. At the time of the objection, plaintiff could not prove that she was the personal representative.

14

The court looked to Rule 17 and determined that "[b]ecause plaintiff was not qualified as the personal representative at the time of trial, Rule 17(a) would require dismissal of the case, but for a saving provision in the rule." Id. at 388 (emphasis added). The court held that the purpose of this provision was "to allow the court to avoid forfeiture and injustice when a technical mistake has been made in naming the real party in interest." Id. The court then afforded the plaintiff a reasonable time (10 days) to remedy the problem.

We find the logic of the district court in Lavean persuasive. Upon finding that the Plaintiffs had not properly named the real party in interest, the district court, under Rule 17, should have provided the Plaintiffs time to cure the problem. Plaintiffs clearly would have had that right to cure had an objection been raised by the Defendant. Plaintiffs should not lose their right to cure simply because the motion was made by the judge, and not the Defendant, at the close of Plaintiffs' case.

III. CONCLUSION

The case presents complex factual and legal issues which are compounded by the considerable time which has passed since the case was originally tried in 1987 and 1988. We have the benefit of several cases from Maryland's highest court which clarify the law with regard to the case at bar. With the benefit of those cases, we reverse the district court as to all issues except its decision to bifurcate the proceeding which was clearly within the district court's discretion.

REVERSED IN PART AND AFFIRMED IN PART

15